SPRING VALLEY WATER-WORKS *v.* BARTLETT, Mayor, etc., and others.

*(Circuit Court, D. California.* March 9, 1883.)

1. INJUNCTION—JURISDICTION TO ENJOIN BOARD OF SUPERVISORS FROM PASSING AN ORDINANCE.

The courts have jurisdiction to enjoin the board of supervisors of a municipal corporation from passing an ordinance which is not within the scope of their powers, where the passage of such ordinance would work an irreparable injury; and, where a proper bill is presented, the circuit court of the United States, or a judge thereof, is authorized by statute to issue a restraining order to preserve the rights of the parties *in statu quo* until the question as to the right of the complainant to an injunction can be fully heard and determined.

2. ORDINANCE VOID ON ITS FACE.

Where an ordinance would be void on its face by reason of its unconstitutionality, and no irreparable injury could result from its mere passage, there being an adequate remedy at law against any attempt to enforce it after its passage, a court of equity will not enjoin its passage.

3. VOID ORDINANCE—IRREPARABLE INJURY.

But where an ordinance would be void for want of authority to pass it, yet if irreparable injury would result from its mere passage, or where there is the physical power to execute the void ordinance, notwithstanding its invalidity, by means of the instrumentalities provided, and the only adequate remedy against an irreparable injury arising from its actual enforcement after its passage is an injunction, the court may enjoin the passage of the ordinance. There appears to be no sound reason why the court should not interfere at one stage of the proceeding as well as at another.

4. UNCONSTITUTIONAL ORDINANCE.

An ordinance which appears upon its face to violate the fourteenth amendment to the constitution of the United States is void, and it can cast no legal cloud upon the rights of the parties apparently affected by it. All parties are legally presumed to know its invalidity.

5. IMPAIRING OBLIGATION OF CONTRACT, ETC.

The corporation known as the Spring Valley Water-works was organized under the statute of 1858, which provided that the price of the water furnished to San Francisco and its citizens should be fixed annually by two persons appointed by the city,—two by the corporation, and one to be chosen by the other

*Martin* v. *Hausman,* 14 FED. REP. 160.

four; and in case the four could not agree, the other to be appointed by the sheriff of the county. The fourteenth article of the constitution of California, afterwards adopted, changed this mode without the consent of the corporation, and provided that the price of the water should be fixed annually by the board of supervisors of the city and county alone, giving the corporation no voice in the matter. *Held*, (1) upon the authority of the *Elevator* and *Granger Cases*, in the supreme court of the United States, that said article of the state constitution is not void, as taking private property for public or private use without compensation, or without due process of law, or as conferring the sole power to fix the price upon the purchaser; (2) that, under the decision in the *Sinking-fund Cases*, it does not impair the obligation of a contract, within the meaning of the several provisions of the constitution of the United States relating to those subjects.

6. DISQUALIFICATION BY REASON OF PLEDGES OF CANDIDATES FOR OFFICE.

Assuming that the citizens of San Francisco are authorized through their representatives, constituting the board of supervisors, to lawfully fix the price of the water furnished by the Spring Valley Water-works to and purchased by the city and its inhabitants, the fact that candidates for the offices of supervisors pledged themselves to the people, in accordance with the requirements of the resolutions of the public meeting nominating them before the election, does not disqualify the supervisors elected upon such pledges from acting in fixing the price of water.

Motion for Injunction.

*C. N. Fox, F. G. Newlands,* and *S. M. Wilson,* for complainant.

*Stanley & Hayes* and *Wm. Craig,* City and County Atty., for respondent.

Before SAWYER and HOFFMAN, JJ.

SAWYER, J. This is an application for an injunction, pending the litigation, to restrain the mayor and supervisors of San Francisco from passing the ordinance set out in the bill, or any other ordinance, to fix the price of water supplied to the city and people of San Francisco for one year, from July 1, 1883, in pursuance of the provisions of article 14 of the constitution of California.

The Spring Valley Water-works is a corporation created under the general statute of California, entitled "An act for the incorporation of water companies," passed April 22, 1858, (St. 1858, p. 218.) Section 4 of this act provides that—

"The rates to be charged for water shall be determined by a board of commissioners to be selected as follows: Two by such city and county or city or town authorities, and two by the water company; and in case that four cannot agree to the valuation, then, in that case, the four shall choose a fifth person, and he shall become a member of said board. If the four commissioners cannot agree upon a fifth, then the sheriff of the county shall appoint such fifth person. The decision of a majority of said board shall determine the rates to be charged for water for one year, and until new rates shall be established."

Article 14 of the constitution of 1879, adopted since the organization of the Spring Valley Water-works under the said act of 1858, and since complainant completed its works and introduced water into the city of San Francisco in pursuance of the provisions of that act, changed the mode of fixing the price of water by providing as follows:

"Provided, that the rates or compensation to be collected by any person company, or corporation in this state for the use of water supplied to any city and county or city and town, or the inhabitants thereof, shall be fixed annually by the board of supervisors, or the city and county or city or town council, or other governing body of such city and county or city or town, by ordinance or otherwise, in the manner that other ordinances or legislative acts or resolutions are passed by such body, and shall continue in force for one year and no longer. Such ordinances or resolutions shall be passed in the month of February of each year, and take effect on the first day of July thereafter. Any board or body failing to pass the necessary ordinance or resolution fixing water rates, when necessary, within such time, shall be subject to peremptory process to compel action at the suit of any party interested, and shall be liable to such further processes and penalties as the legislature may prescribe. Any person, company, or corporation collecting rates in any city and county or city or town in this state, otherwise than as so established, *shall forfeit the franchises and water-works of such person, company, or corporation to the city and county or city or town where the same are collected, for the public use.*"

The complainant insists that said article 14 of the state constitution, so far as it is applicable to the Spring Valley Water-works, is absolutely void, as being in conflict with article 1, § 10, of the constitution of the United States, prohibiting the passage of any law impairing the obligation of a contract; and of the fourteenth amendment of the national constitution, providing that no state shall "deprive any person of * * * property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." It is urged that the provision in the act of 1858, prescribing the mode and tribunal for fixing the price of water, is a term of the contract under which the complainant expended many millions of dollars in introducing water, by the terms of which the vendor as well as the vendee had a voice in fixing its price, which, it is claimed, is a right of great value; while the fourteenth article of the state constitution abrogates that term of the contract, deprives the vendor of any voice in fixing the price of the water it brings into the city for sale, and gives to the vendee—the buyer—the entire control of the price, which it may fix at rates that will be ruinous to complainant; and in case it refuses to submit, the complainant will forfeit all its

property to the city. It is also insisted that for the city to fix the price in its discretion at unremunerative rates, is, to that extent, to deprive the complainant of its property for both public and private uses without compensation or due process of law. Also, that to take from complainant any voice in fixing the price of the commodity which it introduces into the city for sale, and confer the power to determine the price upon the purchaser, is to subject it to conditions and limitations as to the control and free use of its own property not imposed upon other persons with respect to their property, and in this respect deprives the complainant of the equal protection of the laws.

These are grave questions, and their gravity cannot fail to arrest the attention of those familiar with the early public history of the city, whose recollection carries them back to a comparatively-recent period, when our citizens were compelled to procure their daily supplies of water for domestic uses from carts, and to store it in barrels, obtaining for their money much less in quantity, and an article greatly inferior in quality, to that now brought into the city and delivered in every room in their houses, under the stimulus of the inducement to complainant held out by the provisions of the act of 1858.

The first ground of objection to the bill confidently relied on by defendants, though urged in argument apparently less confidently by their counsel, is that they are a legislative body, endowed with legislative powers, to be exercised with absolute discretion; and that they are not amenable to the jurisdiction of this or any other court to inquire into their acts; that neither this court nor any other court has any power in any case to control or limit their action in their legislative capacity; and, consequently, that it has no jurisdiction to investigate their proceedings. In view of the large multitude of cases cited by counsel on both sides, in which the relative powers of the courts and similar municipal bodies have been discussed and determined against those public officers upon various grounds, depending upon the varying circumstances of each particular case, the position, at least, challenges attention for its boldness. But the substantial and principal ground upon which the complainant rests its case, cuts under and lies beyond the reach of this objection. It is that the provision of the state constitution upon which the defendants' authority to deal with the matter in question at all rests, is in conflict with the constitution of the United States; and is, therefore, utterly void. If this be so, then defendants have no authority of any kind, legislative, judicial, or administrative, to deal with the question at all. They are not acting within the scope of their authority, and have no dis-

cretion in the matter.    Article 6 of the constitution of the United States provides that—

"This constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the *supreme law of the land;* and the *judges in every state shall be bound thereby,* anything in the *constitution, or laws* of *any state to the contrary notwithstanding.*"

The supreme court of the United States, from its earliest organization to the present time, has given the fullest effect to this provision. In *Siebold's Case,* so late as 100 U. S. 376, that court said:

"An unconstitutional law *is void and is no law.*   An offense created by it is not a crime."   And again, on pages 392 and 397: "The constitution and laws of the United States are the supreme law of the land, and to those every citizen of the United States owes obedience, whether in his *individual or official capacity.*   * * *   The laws of this state, in so far as they are inconsistent with the laws of congress on the same subject, *cease to have effect as laws.*"

In the presence of this provision, and this authoritative construction of the provision of the national constitution, the provision of the state constitution, if in conflict with it, disappears.    It is as though it had been expunged from the state constitution, leaving a blank page, and the authority of the defendants under it is no greater than that of any other equal number of citizens of San Francisco.    Of course, it is not to be expected that officers, not judicial, of a municipal corporation, will take it upon themselves to adjudge a provision of the state constitution to be void, and disregard it.    But under the constitution of the United States a judicial department of the government has been established expressly to interpret, construe, administer, and enforce all the provisions of that constitution, and of the laws and treaties made in pursuance thereof; and, in the performance of the judicial functions thus devolved upon that department, the courts not only have the jurisdiction, but the duty is imposed upon them to ascertain and adjudge, upon a case presented, whether the provisions of any constitution, law, or proceeding of subordinate governments or bodies, are in conflict with the constitution and laws of the United States; and, if so, to give effect to the national constitution, such subordinate constitution, law, or proceeding "to the contrary notwithstanding."    So, also, the statutes of the United States expressly empower the courts and their judges, when in their judgment a proper case is presented, to issue a restraining order to preserve the subject-matter of litigation *in statu quo,* until time and opportunity can be had to investigate the case, and intelligently determine judicially

whether the party complaining is entitled to an injunction or not. When a case is presented which, in the judgment of the court or judge, justifies such preliminary restraining order, it is a duty imposed upon such court or judge, which he cannot legally evade, if he would, to issue the temporary restraining order, and enforce it to the best of its or his ability, with such aid as may be afforded by the executive department of the government, in pursuance of the duty imposed upon that department by the constitution and laws of the United States.

The action of the court thus far in the matter has been strictly within this broad general jurisdiction and duty. We do not understand that defendant's counsel controvert these propositions. Keeping these general jurisdictional questions distinct from the others that may arise, and do arise in this case, it remains to be considered, whether, as in all other bills seeking an injunction, the facts stated in the bill present, in this particular instance, a case entitling the complainant to the issue of an injunction upon the hearing now had, within the general principles of equitable jurisdiction. Upon this question, counsel for defendants insist with great earnestness that the contemplated action of defendants is strictly *legislative* in its character, within their absolute discretion, and that no court can interfere with or control its strictly legislative discretion; consequently, that the bill presents no case for an injunction.

If the position of complainant is tenable, that the fourteenth article of the state constitution is absolutely void, as being in conflict with the national constitution, then the defendants' proposition, if true, as we have already seen, has no application; for they are acting wholly outside of any authority of law. Their action is neither legal, judicial, nor administrative. There is no discretion, no authority, to act upon the subject at all. The provision is a mere nullity, and that ends the case so far as this point is concerned. But the authorities do not sustain the broad proposition of defendants, as claimed, even conceding some general authority to act. The very case cited by defendants, and in the authorities relied on by them, as sustaining certain distinctions drawn between trusts, legislative action, judicial action, etc., repudiates this proposition. Those cases, however, do not go to the broad proposition insisted upon by defendants' counsel, but go to the special equities of the particular cases in which the points are considered, and relate to abuses of power in cases which, if not fully authorized by law in those particular instances, are within the apparent general scope of their powers, and not absolutely outside of all legal authority to act. The case referred to as a leading one,

and often cited in subsequent decisions, is *Davis* v. *Mayor, etc., of New York*, 1 Duer, 452. In this case, says Mr. Justice DUER, one of the ablest judges who ever occupied the bench in New York city:

"I shall treat the resolution as an ordinance or by-law, and its reconsideration and adoption as properly acts of legislation, in the fullest sense in which the term 'legislation' can be justly applied to the acts of a corporate body. Making these concessions, the denial of the jurisdiction of this court amounts to this: that a court of equity of general jurisdiction has no power, in any case or for any purpose, to restrain the legislative action of a municipal corporation, or in any manner to interfere with or control its legislative discretion, no matter to what subject the action may be directed, nor how manifest and gross the violation of the law, even of the provisions of its own charter, that it may involve; and no matter by what motives of fear, partiality, or corruption its discretion may be governed, and how extensive and irreparable the mischief that, in the particular case, may be certain to result to individuals or the public from its threatened exercise.  *  *  *

"In justice to the counsel for the defendants, it must be admitted that they shrank not from maintaining the truth of the proposition in all its extent, well perceiving that the necessity of the argument admitted no alternative, since to admit a single exception was to admit the jurisdiction which they denied.

"In reply to a question put by the court, it was expressly affirmed by one of the counsel that should the common council attempt, by an ordinance, and from motives manifestly corrupt, to convey, for a grossly inadequate or merely nominal consideration, all the corporate property of the city, neither this nor any other court would have power to suppress, by an injunction, the meditated fraud; or, when consummated, to rescind the grant, or punish its authors, or divest them of its fruits. There could be no remedy, we are told, but from the force of public opinion and the action of the people at an ensuing election; and all this upon the ground that neither the propriety nor the honesty of the proceeding of a legislative body—nor, while they are pending, even their legality—can ever be made a subject of judicial inquiry. This, it must be confessed, is a startling doctrine. We all felt it to be so when announced, and I rejoice that we are now able to say, with an entire conviction, that, applied to a municipal corporation, it is just as groundless in law as it seems to us it is wrong in its principle, and, certainly, would be pernicious in its effects.

"The doctrine, exactly as stated, may be true when applied to the legislature of a state, which, as a co-ordinate branch of the government, representing and exercising in its sphere the sovereignty of the people, is, for political reasons of manifest force, wholly exempt in all its proceedings from any legal process or judicial control; but the doctrine is not, nor is any portion of it, true, when applied to a subordinate municipal body, which, although clothed to some extent with legislative and even political powers, is yet, in the exercise of all its powers, just as subject to the authority and control of courts of justice, to legal process, legal restraint, and legal correction as any other body or person, natural or artificial.

"The supposition that there exists an important distinction, or any distinction whatever, between a municipal corporation and any other corporation aggregate, in respect to the power of courts of justice over its proceedings, is entirely gratuitous; and, as it seems to me, is as destitute of reason as it certainly is of authority. The counsel could refer us to no case, nor have we found any, in which the judgment of the court has proceeded upon such a distinction; nor, in our researches, which have not been limited, have we been able to discover that by any judge or jurist the existence of such a distinction has ever been asserted or intimated. Were it otherwise,—had such decisions been found in English reports, or in those of our sister states,—had it been proved that in England, or other states, the supposed distinction is the established law,—we should still be compelled to say that it is a law which we must refuse to follow, for the plain reason that it is directly inconsistent with the paramount authority of our own constitution. The constitution of the state declares that 'all corporations shall have the right to sue, and shall be subject to be sued, in all courts, in like cases, as natural persons.' Const. art. 8, § 37. There is no exception here of municipal corporations, and an exception which the constitution has not made, we have neither the inclination nor the power to make ourselves.

".A corporation subject to be sued is necessarily subject to every process or order that, in the commencement or in the progress of the suit, may be necessary to or be connected with the relief which is demanded. And the words 'in the like cases' plainly mean, 'for the like acts or omissions and for the like reasons.'"

After further discussion and citation of authorities, the learned judge adds:

"The conclusion from these remarks is that a court of equity will not interfere to control the exercise of a discretionary power *where the discretion is legally and honestly exercised,* and it has no reason to believe the fact otherwise; but *will interfere whenever it has grounds for believing that interference is necessary to prevent abuse, injustice, or oppression, the violation of a trust, or the consummation of a fraud.* It will interfere, and it is bound to interfere, whenever it has reason to believe that those in whom the discretion is vested, *are prepared illegally, wantonly, or corruptly to trample upon rights and sacrifice interests which they are specially bound to watch over and protect."* Case affirmed by the court cf appeals, 9 N. Y. 264.

So the constitution of California provides that "all corporations shall have the right to sue, and *shall be subject to be sued, in all courts in like cases as natural persons.* Article 12, § 4. There is no exception of municipal corporations. They are but corporations at last— their ordinances being but by-laws. The legislature of the state, as a co-ordinate branch of the state government, and the state itself, cannot be sued except by her express permission. *Adams* v. *Bradley,* 5 Sawy. 217; *Carr* v. *U. S.* 98 U. S. 433. I suppose this bill might just as effectually have been filed against the city and county

of San Francisco, without making the mayor or supervisors individually parties at all. But the injunction would operate upon them as agents and officers of the corporation.

Many cases have been cited wherein legislative bodies of cities and counties have been enjoined for gross abuses of their discretion, and for acts apparently within the general scope of their powers, but rendered void as being *ultra vires* by reason of surrounding conditions or extrinsic circumstances, or as violations of trusts, or as being fraudulently exercising their powers. In many of these cases distinctions have been attempted to be drawn in considering the questions arising in the particular case between acts strictly legislative or strictly judicial and those only *quasi* legislative or judicial, or acts partaking of both characters. It is difficult to reconcile all the cases upon such distinctions. But there are cases wherein such bodies have no legal power to act, and their acts are void; yet there is the *physical* power to do the act, and when done, physically or actually, the injury, however irreparable, is accomplished. Or it may be that the contemplated action is the first step in proceedings which the body is physically able, though not legally competent, to follow up to consummation. In such cases we can see no good reason, upon principle or authority, why a court of equity should not interpose at once, in a proper case, to prevent an irreparable injury, whether the void act by which it is to be effected be apparently legislative, judicial, or administrative, or whether it partakes of one or more of those characteristics. Suppose in this case, as a striking illustration, the board of supervisors were about to pass an ordinance directing a seizure of the Spring Valley water-works, authorizing and directing, for instance, the superintendent of streets to take possession and tear up the mains and pipes, and use the material for constructing other works for conducting water from other sources for the use of the city. Such an ordinance would be manifestly and clearly void, as being beyond their lawful powers,—as being utterly *ultra vires;* yet there is the physical power, through the instrumentalties provided, to do the act; and if it should be sought to carry out the ordinance after its passage, the only adequate remedy would be *to restrain the waste* about to be committed by the superintendent of streets by injunction, as it would not be a simple trespass, but also waste. No remedy at law would be adequate, and as a court of equity must restrain it then, we can perceive no good reason why it should not interfere at one stage of the proceeding as well as another,—no objection sound in reason or firmly established by authority why the injunction should not be

interposed at the first step to prevent the passage of such ordinance, though absolutely void, that might eventuate in irreparable injury, as well as at the point where the superintendent of streets should begin to commit the waste under its assumed authority. As before said, the board of supervisors·would be acting without lawful discretion or authority of any kind. Its action would be *utterly lawless*, and only apparently legislative; yet an irreparable injury might result from the physical power to do the act assumed to be authorized, however void or lawless. The test of jurisdiction, it seems to us, should and would be the necessary tendency, and, if carried out, the necessary result, of the void and unlawful act to work irreparable injury.

The special equitable grounds relied on to entitle complainant to an injunction, assuming the fourteenth article of the state constitution to be void, are that the passage of the ordinance will work irreparable injury, and also lead to a multiplicity of suits. It is difficult to see how irreparable injury, in a legal sense, can result from the passage of this ordinance if void upon its face. If the ordinance is void, it is because the provision of the state constitution, under which the defendants are acting, is in conflict with the constitution of the United States and absolutely void on that ground. In legal contemplation, it is only necessary to compare the provisions of the two constitutions to see whether they conflict or not, and everybody is presumed to know the law—to know whether these instruments are in conflict or not. If the ordinance is absolutely void, it can give no right, and can cast no cloud over the rights of complainant. Such is the result of the authorities upon the subject, so far as affording a ground for interference by injunction is concerned.

In *Bucknall* v. *Story*, 36 Cal. 71, the court says:

"It has been settled from an early day in this state, and in accordance with the decisions of other states, that a court will not restrain a sale for taxes, or otherwise, where it is apparent that the sale would be void on the face of the proceedings upon which the purchaser must necessarily rely to make out a *prima facie* case to enable him to recover under the sale. In such case he has a perfect *remedy at law*. The principle is that a proceeding which appears upon inspection to be void, constitutes no cloud."

So, also, on page 74 the court says:

"If the other points are well taken, however, the argument based upon them is *felo de se*. For if no constitutional or valid assessment and sale could be made under the law, or if none was made valid as against plaintiffs, for the reasons claimed, a sale could not affect them or cloud their title; for the void character of the deed would, in like manner, be apparent without other evidence."

So, in *Bucknall* v. *Story*, 46 Cal. 589, it is held that a payment of an assessment *void upon its face,* under protest, is a voluntary payment, not being under any *duress,* as everybody is conclusively presumed to know the law. *Wills* v. *Austin,* 53 Cal. 152; *Williams* v. *Corcoran,* 46 Cal. 556; *Detroit* v. *Martin,* 34 Mich. 173; and *S. F. & N. R. Co.* v. *Dinwiddie,* decided at the last term of this court, (8 Sawy. 312 and 13 FED. REP. 789,) are to the same effect.

In *Branch Turnpike Co.* v. *Sup'rs of Yuba Co.* 13 Cal. 190, complainant filed a bill to restrain the supervisors from fixing the rate of tolls to be charged over its turnpike road,—an act entirely similar to that now in question. It was alleged in the bill that complainant "is an incorporated company under the law, and have, by virtue of their acts as corporators, acquired certain vested rights to collect and fix the rate of tolls to be charged over their road; that defendants, in violation of those rights and without authority of law, are about to pass an order fixing the rate of tolls to be charged on said road, which order may entirely ruin plaintiffs, and cause them to lose the money invested in their enterprise."

The supreme court, reversing the judgment of the court below, which sustained the bill for an injunction, held that "these allegations are wholly insufficient to warrant the interference of a court of equity;" that they do not show irreparable injury; and said: "If the allegation of want of authority in defendants be true, *any order which they might make in the premises would be a mere nullity,* and could in no way prejudice the rights of the plaintiff. On the contrary, if this allegation be not true, defendants should not be restrained from performing a plain duty."

In *Burr* v. *Hunt* a bill was filed to restrain the sale of land upon a tax void upon its face, and denied, on the ground that a sale upon a void tax could not injure the owner. The tax collector was alleged to be proceeding under a repealed act. The supreme court, Mr. Justice FIELD concurring, said: "If the tax collector is proceeding under that repealed act it is difficult to see how any man's title could be clouded by force of any proceedings under it. The presumption of knowledge of a law passed, or a law repealing a former act, attaches to every citizen." 18 Cal. 307. Again: "If the act of 1859 be *unconstitutional, it creates no cloud upon the title;* if it be not, and the act embraces and validates this alleged assessment of 1857, then there is no pretense for an injunction." Id. 308. A similar principle is adopted in *Pixley* v. *Huggins,* 15 Cal. 133, 134, Chief Justice

FIELD delivering the opinion of the court. And such is the principle established by numerous authorities. See *Wells, Fargo & Co.* v. *Dayton*, 11 Nev. 167, and cases cited.

In *Leach* v. *Day*, 27 Cal. 644, a bill was filed to restrain a simple trespass, there being no waste, in laying out a road under the authority of the board of supervisors, alleged to be void. A perpetual injunction was granted. On appeal the supreme court reversed the judgment, and said:

"So far as the plaintiff's right to *equitable* relief is based upon the alleged invalidity of the acts of the board of supervisors in laying out the road in question, the complaint is manifestly *felo de se*. If, as contended, those acts are absolutely null and void on their face, upon the ground that the act under which they were had is unconstitutional, it follows that they cannot hurt the plaintiff, for they have not even the appearance of legality, and therefore cannot affect or cloud in any manner his title. In such a case he has no need for an injunction, and therefore is not entitled to one."

It is said that the passage of the ordinance, though void, gives a color of right, and through the fears of parties largely diminishes the value of the property. But such diminution of the value of the property, if any there be, is the result of the fears of those dealing or wishing to deal in it, and are of a consequential nature. It is an incident entirely accidental, and it is not the legal or necessary result of the void action of the board of supervisors. It does not follow as a legal consequence. It is not, in contemplation of law, an injury. It may be an accidental, consequential damage, but, in law, is damage without injury—*damnum absque injuria*. The ordinance does not propose to *take possession* of the water, or the water-works, or to commit any waste. It does not interfere with it in any way except to fix the price at which it is to be sold, which, on the assumed premises, is void. Assuming that the ordinance will be absolutely void, as claimed, we do not perceive why there will not be an adequate remedy at law. If it is void, the complainant certainly need not furnish the water at the price, for there will be no law requiring it. In that event it can only be required to furnish water at a reasonable price. We do not perceive why the complainant has not the remedy in its own hands by shutting off the water as to those who decline to pay a reasonable price, or by suing and recovering a reasonable price in a judgment at law. No one is bound to purchase at any price unless he chooses to do so, and he is not entitled to be supplied except at a reasonable price. The citizens can supply themselves from other sources if they choose to do so. If an attempt is made to for-

feit the works under the last clause of the constitutional provision in question, it must be by suit at law upon an information in the nature of a *quo warranto,* when, if the ordinance is void, it will be so adjudged; at least, that is the presumption of law, and that will settle the question. Any one suit at law involving the question of the validity of the ordinance, carried to the court of last resort, would settle the question as to the validity of the ordinance, and we do not perceive how the mere passage of the ordinance would lead to a multiplicity of suits in the sense of the law which constitutes a ground for the exercise of equitable jurisdiction. Under the authorities it does not appear to us that any recognized ground of equitable jurisdiction for continuing the injunction is shown in the bill, affidavits, etc., upon which the case is submitted. There appears to be an adequate remedy at law, and in such case this court is expressly forbidden to sustain a suit in equity by section 723, U. S. Rev. St.

The writ of injunction is sometimes aptly called the "right arm of a court of equity." We confess we sometimes think that in this class of cases the "right arm" of the chancellor is not quite so long as it ought to be. It is a very severe rule that requires all parties to take notice whether a statute, or a provision of a state constitution, is valid or not. The legal presumption that every party knows what the law is, cannot possibly be realized in fact or in practice. How is it possible, upon questions which are open to discussion, that a litigant can unerringly determine in advance what the opinion of three, five, or nine men, however eminent they may be, constituting the court of last resort, will be, when the judges themselves often take adverse views, and sometimes determine the question by a bare majority, as five to four, or "eight to seven?" A judgment is even sometimes affirmed upon an equal division of the judges in the appellate court. It seems a severe rule that in questions of the highest importance the party must, at his peril, determine in advance what the ultimate decision of the courts will be. Sometimes damages little short of absolute ruin may result from an erroneous determination; and this case affords a striking illustration of what the consequences of error may be—the forfeiture of all their property, of several millions in value. Yet the length of the chancellor's arm is limited in this particular by well-settled principles, which we are not authorized to overthrow or disregard. If, therefore, the provision of the state constitution in question is absolutely void on its face, there is no equitable ground for enjoining the passage of the proposed ordinance, and the injunction must be denied on that ground. If valid,

the passage of the ordinance is within the authority of the supervisors, and, of course, ought not to be restrained.

The duty of deciding whether a state statute or constitutional provision is void, as being in conflict with the national constitution, is always one of the most delicate nature. Yet it is a duty, however delicate, which the proper courts are sometimes compelled to perform. The unconstitutionality of a state statute or constitutional provision must very satisfactorily appear in order to justify even the court of last resort in declaring it void. This is the united voice of all the authorities upon the subject. *A fortiori*, is this true of a subordinate court of original jurisdiction. Whatever our opinion might otherwise have been, in view of the authoritative decisions of the supreme court of the United States in the *Elevator Case*, and the *Railroad Cases* immediately following it, all of which are known as the *Granger Cases;* and in the *Sinking-fund Cases,*—can we properly say, without reasonable doubt, that the provision of the state constitution in question is void, as being in conflict with the several provisions of the national constitution invoked? After mature consideration, we do not think we can.

In the *Elevator Case,* Messrs. Munn & Scott, two citizens of Chicago, Illinois, having erected upon their own land, held, as other lands in Chicago are held, in private ownership, an elevator for the storage of grain for hire; received such grain as parties desiring its storage offered, and charged such prices as they and other proprietors of elevators agreed upon and fixed, and as parties storing grain were willing to pay, and did pay, for such storage. The new constitution of Illinois declared that "all elevators or structures where *grain or other property* is stored for a compensation * * * are declared to be public warehouses." So that the provision extends to *all warehouses* where *any kind of property is stored.* The legislature of Illinois passed an act regulating storage in the several classes of warehouses, and, among other things, established a limitation upon the price for storing grain at a sum less than that charged by Munn & Scott and other proprietors of elevators, and paid by their customers, and made it a penal offense to charge a higher rate than that limited. Being criminally charged and convicted under this act, an appeal was taken to the supreme court of Illinois, where it was insisted by Munn & Scott that the statute of Illinois was void, as being in conflict with the third clause of section 8, art. 1, the sixth clause of section 9, art. 1, and of the fifth and fourteenth amendments of the constitution of the United States; all of which points were overruled

by the supreme court of Illinois. That decision was affirmed on writ of error by the supreme court of the United States. Munn & Scott received no franchise or grant, or anything else, from the state of Illinois as a consideration upon which to base this restrictive legislation. They were simply the private owners of land, and, like other owners of private property, erected elevators upon it, and devoted it to storing grain for such persons as chose to patronize them, and upon terms agreed upon. Munn & Scott claimed that as they owned the property, had asked and received nothing from the state, they were entitled to use it as they pleased for any lawful purpose, and to fix their own price for the use of it; that people could use it or not upon the terms offered, as they pleased. The people of Illinois, through their representatives, fixed the price of storage. Doubtless many of the members of the legislature itself were among the patrons of the elevators,—at least, they are likely to be, as Illinois is an agricultural state, and many agriculturists and dealers in grain and other agricultural products, producers of those articles, who were also interested in the price of storage, as it affected the market price of the products, must have been among these members. At least, the members must have represented those storing grain and interested in storing grain in the elevators of Munn & Scott, if they were not personally their patrons. Thus, the price of storage under the law was fixed by the persons using the warehouses of Munn & Scott, either directly, as members of the legislature, or as being representatives of those who used them, in the same way and in the same sense as the supervisors, being consumers and representatives of the consumers of the Spring Valley water, fix the price of that commodity.

The principle, as applied to grain elevators, applies to all other warehouses storing any kind of property. We are unable to distinguish this case from the *Elevator Case,* or take it out of the rule laid down by the supreme court in that case. The only ground of distinction relied on by complainant is that in the *Elevator Case* the legislature only fixed the price of the *use* of the warehouse, while the board of supervisors fix the price of the commodity itself and take the whole. We cannot perceive that this difference affects the principle upon which the decision rests. It simply goes to the degree of the interference, and not the principle. The right to the use of property is one of the essential elements of property. The use is a part of the property. The man who leases property, or acquires the right to its use, has an interest or estate in it to the extent of his

right, whether it be of a longer or shorter duration,—an absolute or qualified right of use. To the extent of his interest, the right to the use of a thing is as much a right of property and is as sacred as the right to the *corpus* itself. An elevator, erected at great cost, can only be of use for storage of grain or other goods, and to fix the price at such a sum that it will not pay actual expenses would render the property valueless, and be as directly a destruction of the property itself as if it were taken into possession or otherwise appropriated. The continued use makes up the whole value of the thing itself. The only value in water, as in an elevator, is in its use,—in its availibility to contribute to the advantage and enjoyment of the owner. To fix the value of its use for domestic and other purposes pertaining to the supply of water to cities, is, necessarily, to fix the price of the *corpus* of the water. So, also, to fix the price of the storing of grain or other commodities is as necessarily to fix the value of the elevator or warehouse itself in which it is stored. We are unable to satisfactorily take this case out of the decision in the *Elevator Case*.

We find ourselves equally unable to satisfactorily distinguish this case from the *Sinking-fund Cases*. The Union and Central Pacific Railroad Companies built their roads and put them in operation in all respects as required by the terms of the contract contained in the acts of congress under which they were constructed; and they earned the rights and compensation which they were entitled to receive under their contract with the government. The contracts had ceased to be executory and had become fully executed, except as to the future operation of the road, and the performance of the current services required by the government after completion for the stipulated compensation. But this was a distinct contract for the use of the road after completion. The rights of the company had become fully vested under the contract. Yet congress passed an act changing materially the conditions and rights to which these companies had become entitled. Instead of putting one-half of the earnings from transportation of freight required by the government, and 5 per cent. of the net earnings of the roads, into a sinking fund, as originally provided, they were required by the new act, without the consent of the other parties to the contract, to put the whole of such earnings and 25 per cent. of the entire net earnings of their roads, till it should reach a specified amount, into that fund. Yet the supreme court held that it was competent for congress—one of the parties to the contract—without the consent of the railroad companies—the other parties—to make this modifica-

tion, and that this legislation was entirely constitutional under the powers reserved in the act "to alter and amend." The court said:

"We think it safe to say that whatever rules congress *might have prescribed* in the *original charter* for the government of the corporation in the administration of its affairs, *it retained the power to establish by amendment.* In so doing, it cannot undo what has already been done, and it cannot unmake contracts that have already been made; *but it may provide for what shall be done in the future, and may direct what preparation shall be made for the due performance of contracts already entered into.*" 99 U. S. 721.

And it did make requirements not contained in, and far more onerous than those provided for, in the original act. It is conceded that the legislature in the act of 1858, under which the complainant was organized, might have legally incorporated the present provision of article 14 of the state constitution, and that the company would then have been compelled to accept the terms offered as a condition of organization and pursuing its calling. It must have accepted the terms or not have organized. If, then, it be true, as said by the supreme court in the *Sinking-fund Cases,* that congress was authorized under the power of amendment retained in the act to insert, as a condition of the future continuance of existence, and of pursuing the proper business of the corporation, any provision that it might have originally inserted in the act, it is difficult to see why the amendment in question to the act constituting the foundation of complainant's charter is not also authorized under a similar reservation in the old constitution of California, under which the act of 1858 was passed, the provision being: "All general or special acts passed pursuant to this section may be altered from time to time, or repealed," (Old Const. art. 4, § 31;) language broader in its scope than that employed in the act of congress incorporating the Union Pacific Railroad Company, and the acts amendatory thereto.

In the *Sinking-fund* and *Granger Cases* three justices dissented, but the judgments had the concurrence of a majority of the court, and, whether right or wrong, they are law to this court. We are unable to take this case out of the rules established by those cases.

It is well known, and it was conceded at the argument, that a case in which the complainant is appellant, presenting the precise constitutional questions we have been considering, was submitted to the supreme court for decision on printed arguments, under the rules of the court, at the October term, 1881, of that court; that upon examination the court, not being satisfied as to what the decision should be, set aside the submission and ordered a reargument at the present

term.  Knowing these facts, and pending this case, it would be little short of presumption in us, in advance of the decision of the points in that case, to hold that the unconstitutionality of article 14 of the constitution of California so satisfactorily appears as to justify us in declaring it void, and, on that ground, grant the injunction sought, especially as this court could as well interfere by injunction afterwards to prevent the execution of the ordinance, as now to prevent its passage, should it be held by the supreme court to be void.  Besides, the supreme court of California upheld the provision of the state constitution in question in *Spring Valley Water-works* v. *Board Sup'rs San Francisco,*—the case now before the supreme court of the United States.  7 Pac. C. Law J. 614.

While the decisions of the supreme court of the state are not controlling in the national courts upon questions as to whether state laws and constitutions conflict with the constitution of the United States, they are certainly entitled to the very greatest respect; and where that court sustains the constitutionality of a law, and the supreme court of the United States itself hesitates, it can hardly be expected that we should be swift to say that the provisions in question are so clearly unconstitutional as to justify us in declaring them void for the purpose of granting the provisional remedy of an injunction before a final hearing of the case.

It is insisted that the anti-election pledges of the members of the board of supervisors, set out in the bill, disqualify them from acting in fixing the water rates, and that the injunction should be granted on that ground.  We do not conceive that we are authorized in this collateral way to inquire into the personal qualifications of the several members of the board of supervisors, to sit as members of that board generally, or in particular cases.  They are regularly elected, accepted, and qualified members of the board, and are acting as such in pursuance of the laws organizing said board, providing for the election and qualification of its members.  We have no jurisdiction to review the subject of their personal qualifications.  Being members, they are authorized to perform such duties as legally come within the purview of the authority of the board.  But suppose it were otherwise: we are still thrown back upon the question already discussed—the constitutionality of the provisions of the state constitution under which the supervisors are assuming to act.  If it be competent at all, under the provisions in question, for the people of San Francisco, through their representatives in the board of supervisors, to pass the proposed ordinance, and they had determined

to do so, it is difficult to perceive why, in looking around for agents or representatives to carry out their will, it is unlawful to ask in advance whether those seeking to represent them will obey their command in these particulars, or to require a pledge to that effect before committing the trust to them. I suppose a banker or any other business man, about to appoint a cashier or other agent, would be entitled to require a pledge of the applicant for appointment to transact the business in accordance with the views of the principal, rather than follow his own ideas of what should be done. It may be that it would be more conducive to the public interests, and better comport with his own personal dignity, if a candidate for employment in some great public legislative trust would decline to pledge himself further than to examine every question presented for legislative consideration fully and fairly, in the light of all attainable information, and then act in accordance with the dictates of his best judgment as to what the public interests really required. But this is not the question presented for our consideration. It is a question as to what the people are authorized to do through their representatives, and what they are lawfully authorized to require of those seeking to represent the people under the provision of the constitution of the state in question. This is not like the cases cited of candidates who promise to serve without salary or compensation in case of their election. That is palpable bribery—an offer to purchase an election for a money consideration—not a mere expression of coincidence of opinion and promise of co-operation with the constituent in securing a lawful object. It makes no difference whether the candidate offers the gross sum of his salary to his constituents in a body, or whether he takes his salary in the usual way, but before the election uses an equal amount of money in buying up individual votes at small sums each. One mode of buying votes is, in effect, as clearly bribery as the other. But conceding the right of the people to do the act pledged through their representatives, the act now under consideration is simply requiring in advance of his appointment a promise from the agent or representative that he will do what the principal is authorized to do, and what he would do himself if he could act in person. And the only question for us to consider is, is such a pledge illegal in such sense that a court can say it will vitiate all his acts within the purview of his pledge? We cannot say that it is.

It is urged with great earnestness and ability, with an abundant citation of authorities bearing upon the point, that the city itself,

whose mouth-piece the board of supervisors is, is the largest con- sumer of water furnished by complainant, and that the members of the board personally, and the people, whose agents they are, are the consumers of the remainder; that the vendees, therefore, alone fix the price of the commodity purchased, and which complainant is compelled to sell; that the action is judicial in its nature, not legis- lative; and that, upon the well-settled principles of individual and public rights, independent of all legislation and constitutions, one cannot sit as judge in his own case. If the validity of the constitu- tional provisions depended upon the distinction between judicial and legislative action, still, fixing the price of water for the future can hardly be called strictly or purely judicial. The action of the board is to establish a rule for future guidance, not to determine whether past transactions are governed by a rule before established and ad- just the rights of the parties in accordance therewith. The proposed action would certainly seem to partake, in part at least, of the qual- ity of legislation. It may require inquiry and the exercise of judg- ment to enable the supervisors to act intelligently; but that is true of all legislation. Most acts of such deliberative bodies involve action in some sense of both a judicial and legislative character. But we need not seek for any nice distinctions in these particulars, as we must go back to the main question at last, and doing that we find the case covered by the *Granger* and *Sinking-fund Cases*, already considered. In the first, the price of the services performed by pri- vate parties, deriving no rights from the state, with their own means and property, was held to be properly fixed through their represent- atives by the parties receiving the service; and in the latter, under the reserved power to repeal and amend, that vested rights of one party under an executed contract with reference to the future, might be modified by the other party to the contract—said party being in a similar sense a judge in its own case. It can make no difference in this case that the power to fix the rates is vested in a municipal body, instead of the state legislature, because it derives the authority to fix them from the state constitution—directly from the sovereign power— and not by a redelegation of delegated power by the legislature. This objection, that a person cannot be a judge in his own case, was not accidentally overlooked, for it was expressly pressed upon the atten- tion of the court by Mr. Justice FIELD in his dissenting opinion. Citing the case of *Calder* v. *Bull*, decided so long ago as 1789, and quoting from the opinion of the court rendered by Mr. Justice CHASE, he said:

"In *Calder* v. *Bull*,  *  *  *  Mr. Justice CHASE said that there were acts which the federal and state legislatures could not do without exceeding their authority; and among them he mentioned a law which punished a citizen for an innocent act; a law that destroyed or *impaired the lawful private contracts of citizens;* A LAW THAT MADE A MAN A JUDGE IN HIS OWN CASE; and a law that *took the property from A. and gave it to B.*  'It is against all reason and 'justice,' he added, 'for people to intrust a legislature with such powers, and therefore it cannot be presumed that they have done it. They may command what is right and prohibit what is wrong, but they cannot change innocence into guilt, or punish innocence as a crime, or violate the right of an antecedent lawful private contract or the right of private property. To maintain that a federal or state legislature possesses such power if they had not been expressly restrained, would, in my opinion, be a political heresy altogether inadmissible in all free republican governments.'  3 Dal. 383."  99 U. S. 765.

The act under which the complainant was incorporated and in pursuance of which it executed its part of the contract by introducing into the city pure fresh water at an expense, as is claimed, of from ten to fifteen millions of dollars, provided that the rates to be charged should be fixed by a board of commissioners to be selected, "two by such city and county,  *  *  *  two by the water company; and in case that four cannot agree to the valuation, then, in that case, the four shall choose a fifth person, and he shall become a member of the board; if the four commissioners cannot agree upon a fifth, then the *sheriff of the county* shall appoint such fifth. The decision of the majority of said board shall determine the rates to be charged for water for one year, and until new rates shall be established." Even under this arrangement, which gave complainant a voice in fixing the price of the commodity furnished by it for the use of the city and its inhabitants, the advantage was on the side of the public, as, in case of a disagreement of the representatives of the two parties to the contract, the umpire was appointed by one of the principal officers of the municipality, whose position was wholly dependent upon the votes of the consumers. By the provision of the state constitution in question, adopted after the complainant had expended large amounts of money in executing the contract, and its rights, whatever they were, became vested, it was provided that the rates of compensation to be collected for the use of water supplied to any city and county or city or town, or the inhabitants thereof, "shall be fixed annually by the board of supervisors  *  *  *  of such city and county." And it was further provided that—

"Any person, company, or corporation collecting water rates in any city and county or city or town in this state, *otherwise than as so established, shall forfeit the franchise and water-works of such person, company, or cor-*

*poration to the city and county or city or town where the same are collected for the public use."*

It would seem to be only necessary to make this brief statement of the case to enable one of ordinary intelligence, endowed with a reasonable share of moral sense, to perceive the monstrous injustice of thus placing the large investments of complainant, made under the stimulus of the inducement held out by the act of 1858, at the absolute mercy of an irresponsible public sentiment or of public cupidity. This last provision would seem to offer a large premium for the perpetration of a wrong; a large inducement to the purchaser—the consumer—to fix the price at unremunerative rates in order to secure the large property by forfeiture and confiscation, or to so largely diminish its value as to force a sale to the city at a price far below its real value.   It was alleged in the argument, and not denied, to be a matter of public history and public notoriety, of which we are authorized to take notice, that such designs have been openly and publicly avowed and advocated by public speakers.   It is no answer sound in morals or honest in a business point of view, whatever it may be in law, to the wrong complained of by the complainant, that if it does not like the conditions of its future existence imposed upon it by article 14 of the state constitution, it can withdraw from this field of enterprise.   It cannot withdraw without a sacrifice of its large investments, nor can it suspend its operations for a single day without inflicting untold misery upon a large population, and it might involve the destruction of the city.   Its investment is useful and valuable for no other purpose than to supply water for the use of the people of San Francisco.   To fix the price at unremunerative rates is to confiscate the property.

When the supreme court in the *Sinking-fund Cases* said, "Whatever congress might have prescribed in the original charter for the government of the corporation in the administration of its affairs, it retained the power to establish by amendment," it added, "in so doing *it cannot undo what has been already done; and it cannot unmake contracts that have already been made.*"

It is urged that this reservation embraces the case of the Spring Valley Water-works now under consideration; that the contract under the act of 1858 gave the complainant a voice in fixing the price of water, while the constitutional provision in question takes it away and gives the power to fix the price to the purchaser of the water alone, and that there is no limit on its power to reduce the price; that a reduction to an unremunerative rate, which is claimed to be

contemplated, would render it impossible to pay its debts or continue the supply of water, and that the result would be a confiscation of the large investments made; that these investments constitute what "*has been done,*" under the contract, and by this means to deprive the company of its capital so invested, and of the rights which have. become vested under the contract of 1858, which has become fully executed on the part of complainant, is not only to impose further conditions upon its future existence, and the further exercise of its functions, but is to *unmake contracts* that "have already been made" and have already been executed, and undo what has already been done; that, although it is not bound to accept the new conditions imposed, but may dissolve and retire from business rather than submit to such conditions, yet to retire is to sacrifice its large investments, as they are available for no other purpose, and would be as ruinous as to go on at a loss. To us there appears to be very great force in these propositions, and, if these were new questions, this argument would certainly be entitled to most serious consideration. But the *Sinking-fund Cases* involved substantially the same conditions, and they are, therefore, controlling. If congress in these cases, after the contract had been executed and the rights of the corporations had been vested under it, could require them to pay into the treasury for a sinking fund the whole of the earnings for freight carried for the government, when the original contract only required half, and pay into the treasury 25 per cent. of their net earnings, when such contract only required 5 per cent., it is not easy to perceive why it could not require a similar payment of all their net earnings, or even of the gross earnings. The right to demand half or one-quarter, involves the right to demand all.

Chief Justice MARSHALL says, "the power to tax involves the power to destroy." So, as there is no limit, the power exercised in the *Sinking-fund Cases* involves the power to destroy. Should the amount demanded be so great as not to leave sufficient money to enable the companies to operate their roads, and require suspension, their property would, to all intents and purposes, be as effectually destroyed as if wholly taken and appropriated to public use or blotted out of existence. They could no more decline to accept the conditions upon which their future existence and the future operations of the roads depended, without a sacrifice of all that had before been invested and acquired under their contracts, than could the Spring Valley Water-works. Their property would be of no use or value except for railroad purposes; and if it could not be used for that purpose by reason of the onerous

conditions imposed by congress under its unlimited power to amend, it would be equivalent to its loss. There would be an undoing of what "had been done," by making investments under it, and unmaking a contract that "had already been made," in the same sense as is claimed in case of the Spring Valley Water-works. The conditions of the two cases appearing to us to be precisely similar in these particulars, the decision in the *Sinking-fund Cases* must govern us on this point also. If those decisions are to be in any way qualified or limited, it can only be done by the supreme court itself.

If this provision of the state constitution should be finally sustained by the supreme court of the United States, there are but two courses for complainant to pursue—either to submit to such wrongs as may be imposed from time to time at the demand of the people, or sacrifice its investment and retire from the field, unless the power should be exercised in so outrageous a manner as to call upon the courts to interfere in some mode, if any there be, to protect it on the ground of fraud, oppression, or gross abuse of power. In this case, also, the power to fix the price of water is the power to destroy, and that power is now vested in the purchaser alone. The complainant may pertinently repeat the question of the great chief justice, "Is it a case for confidence?" We refer to this matter, not as intending to express an opinion that the action at present contemplated will, in fact, work a great wrong to the complainant, as we are not now sufficiently advised on that point to determine the question, but to call attention to what may be done under the power, in obedience to excited popular sentiment, should the validity of the provision be ultimately sustained. The complainant alleges in the bill that the reduction contemplated in the proposed ordinance will be so great as to ruinously affect its property; and, indeed, it is claimed in the argument that, under the circumstances, the establishment of the rates as provided in the ordinance will constitute an abuse of discretion calling for judicial interference. But this application is made and rests on the bill alone, unsupported by other evidence, and the facts on this point are distinctly met by a denial by the affidavits of the defendants. This is a sufficient answer to the application for an injunction, if the court is authorized to interfere on that ground.

We are, therefore, not called upon to determine at present whether the prices contemplated are so low as to constitute an abuse of the discretionary powers of the supervisors, assuming the constitutional provision under which they are acting to be valid when properly executed, or, if an abuse of their discretion, what relief it is competent

for the court at this or any other stage of the proceedings to afford. To determine this question now would be to decide the case before hearing the evidence.

We believe we have disposed of all the points relied on by complainant. For the reasons stated an injunction must be denied; and it is so ordered.

The preliminary restraining order, issued to preserve the rights of the parties *in statu quo* till the merits of the case presented by the bill could be considered and determined, having performed its office, is now dissolved.

HOFFMAN, J. By the act of 1858, under which the company went into operation, it was authorized to charge reasonable rates, to be fixed by arbitration, as therein provided.

By the fourteenth article of the constitution of 1879 the board of supervisors was authorized and required to fix the rates.

The complainant contended that this article was void: (1) Because it impaired the obligation of a contract; (2) because it sought to take property for public use without compensation; (3) because it deprived the company of its property without due process of law.

Many other questions were raised and elaborately argued at the bar. The validity of article 14 is the only question discussed in this opinion.

In *Munn* v. *Illinois* and the other cases, known as the *Granger Cases*, the supreme court of the United States has decided that whenever private property is affected by a public use, or whenever a private individual devotes his property to such uses as to create an interest in those uses on the part of the public, the public, through the legislature, may determine the compensation he shall charge for the use of his property. And this, notwithstanding that the owner is not a corporation, possesses no franchise, and exercises no rights, except such as are incidental to the ownership of property. "When, therefore," says the court, "one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use he must submit to the control." It will hardly be urged that the poor privilege of escaping the control by discontinuing the use is available to a company upon the use of

whose property the inhabitants of a large city depend for their daily supply of water.

In the *Granger Cases* it was held that fares and freights of railroads may be fixed by legislation, even in cases where the charter gave the company the right to establish and charge such rates of fares and freights as *it* should deem reasonable, and that the right reserved in the charter or by general law "to alter and repeal," gave to the legislature the authority *by subsequent amendment to prescribe any rules for the government of the corporation in the administration of its affairs which it might have prescribed in the original charter.*

It has also been held by the supreme court that the right reserved by the constitution of a state to alter and repeal all laws creating corporate privileges is an inalienable legislative power, and that this power cannot be limited or bargained away by any act of the legislature, because the power itself is beyond legislative control. *New Jersey* v. *Yard*, 95 U. S. 104. The effect of these decisions is attempted to be avoided by the suggestion that in the *Elevator Case* the legislature merely regulated the use of the property, but did not attempt to touch the property itself, while the constitution of this state, and the ordinance it directs to be enacted, fix the price at which the complainant's property, viz., the water it owns, shall be furnished. But this distinction between taking property and depriving its owner of its use seems metaphysical and illusory. The value of all property consists in its use and beneficial enjoyment. The right of property is as substantially invaded by restricting its use as by appropriating it. What remains of the right of property of a landlord if he is forbidden to charge rents to his tenants, and if the same prohibition extends to those to whom he may sell it? Is not the right of property in a coat destroyed if the owner is forbidden to wear it, or if onerous restrictions are imposed upon its use? If, then, the legislature may lawfully fix the price which the owner of certain kinds of property may demand for its use, they may fix it at such rates as will amount to its practical confiscation, and in effect will deprive him of the property itself, although, technically speaking, the title may be untouched.

2. The only use which the complainant can make of the water it owns is, except so far as the shareholders may apply it to their own individual consumption, to distribute and supply it to consumers in this city. They use it for this purpose, and the right to receive compensation for this use alone gives value to their property. When,

therefore, the price they are to receive is made the subject of legislative regulation, the use of the property is regulated to the same extent and in a similar way as the use of the elevators was regulated by fixing the price to which their owners were to charge for the use of those structures.   The title of the company to its dams, its reservoirs, its areas of catchment, its pipes, and its pumping apparatus are not touched by the proposed ordinance.   It is only when the water is brought into the city and sought to be used by supplying it to consumers that the ordinance proposes to regulate that use by fixing the rates to be charged.   The soundness or justice of the principles established by the supreme court we are not at liberty to dispute or discuss.   Our duty is to obey; and to attempt, while admitting the authority of the case of *Munn* v. *Illinois,* to take this case out of the operation of the principles laid down in it by virtue of the distinction suggested, would, it seems to me, be a sophistical, if not a disingenuous, evasion of our duty.   If the doctrine of that case and of the *Granger Cases* and of the *Sinking-fund Cases* are to be overturned or modified, it must be by the supreme court, not by us.

It is claimed that the law of 1858, which provided that the *reasonable rates* which the company was entitled to charge should be fixed in a specified mode, viz., by arbitration, was in the nature of a contract, the obligation of which cannot be impaired by subsequent legislation.   But this position seems to be untenable under the decision of the supreme court in *Peik* v. *C. & N. W. Ry. Co.* 94 U. S. 164.   In that case the railroad company was, by its charter, authorized to receive such sum or sums of money for the transportation of property or persons as it should deem reasonable.   The constitution of Wisconsin, in force when the charters were granted, provided that all acts for the creation of corporations within the state might be altered or repealed by the legislature at any time after their passage.   It will be seen that the circumstances of this case are even stronger than those of the case at bar.   By the charter of the railroad company, not only was the mode of determining what should be a reasonable compensation provided for, but the right to make that determination was expressly conferred on the company itself.

It was urged, and with greater plausibility than in the case at bar, that this provision of the charter was in the nature of a contract, the obligation of which could not be impaired by the legislature, and, were it otherwise, the will of each succeeding legislature, and not the contract, would determine the rights and obligations of the company;

that the act of the Wisconsin legislature, so far from leaving the material property and rights of the corporation inviolate, took from it the income, and thus as effectually deprived it of the beneficial use of its property and the means of fulfilling its engagements with its creditors as if the road had been confiscated; that there was no substantial difference between a law which diminished the income of a company by 30 per cent., by reducing its tariff or rates, and one which requires it to pay 30 per cent. of its rates to the treasurer of the state, to be by him distributed among those who paid fares or freights to the company.

It was therefore contended that the legislation in question was unconstitutional, because it impaired the obligation of a contract, because it took property for public use without due compensation, and because it deprived the company of its property without due process of law; and that the reservation of the right to alter or repeal acts regulating corporations conferred no power to violate these fundamental constitutional provisions.

It will, I think, be difficult to distinguish the case of the complainant, and the grounds on which it is rested, from the case thus presented to the supreme court.

The court held that the privilege of charging whatever rates it might deem proper was a franchise which might be taken away under the reserved power; that the right to fix a reasonable compensation for the use of property which has been clothed with a public interest rests with the legislature, and that its determination binds the courts as well as the people. "If it has been improperly fixed, the legislature, and not the courts, must be appealed to for the change." 94 U. S. 178.

In *Tomlinson* v. *Jessup*, 15 Wall. 457, the supreme court says:

"It is true that the charter of the company, when accepted, *constituted a contract between them and the state, and that the amendment, when accepted, formed a part of the contract from that date, and was of the same obligatory character.* And it may be equally true, as stated by counsel, that the exemption from taxation added greatly to the value of the stock of the company, and induced the plaintiff to purchase the shares held by him. But these considerations cannot be allowed any weight in determining the validity of the subsequent taxation. The power reserved to the state by the law of 1841 *authorized any changes in the contract* as it originally existed or as subsequently modified, or its entire revocation. The original corporators or subsequent stockholders took their interests with knowledge of the existence of this power, and the possibility of its exercise at any time in the discretion of the legislature. The object of the reservation, and of similar reservations in other charters, is to prevent a grant of corporate rights and privileges in a

form which will preclude legislative interference with their exercise if the public interest should at any time require such interference. It is a provision intended to preserve to the state *control* over *its contract* with the corporators, which, without that provision, would be irrepealable, and protected from any measures impairing its obligation." Per FIELD, J.

It will be observed that the existence of a *contract* is here expressly admitted by the supreme court, but it declares that "the power reserved" (viz., to alter or repeal) authorized "any change in the contract as it originally existed or as subsequently modified, or its entire revocation."

In his dissenting opinion in the *Sinking-fund Case,* 99 U. S. 749, Mr. Justice BRADLEY says:

"By reason of the reserved power to alter and repeal a charter, this court has sustained legislative acts imposing taxes from which the corporation by the charter was exempted. * * * A reservation of the right to legislate, or, which is the same thing, to alter, amend or repeal the charter, necessarily includes the right to resume taxation. *The same observations apply to the regulation of fares and freights,* for this is a branch of the police power applicable to all cases which involve a common charge upon the people."

I am unable to see how the force and application to this case of these judgments of the supreme court can be ignored or evaded. Whether the rates proposed to be established by the supervisors in this case are reasonable, we have neither the means of judicially knowing nor the right in this proceeding judicially to inquire. If, as alleged in the bill of complaint, it be true that the proposed reduction of rates will so diminish the income of the company as to render it unable to pay the interest on its indebtedness, and to maintain and complete its system for the water supply of this city, its inhabitants may hereafter have cause to lament that the completion of that system, now seen to be indispensable as a security against the horrors of a water famine, has been rendered impracticable. Whether the deprivation of all voice or right to be heard in the establishment of its rates, and the conferring of that right on the representatives of the consumers exclusively, thus making them "judges in their own cause," is a reasonable or just mode of determining what rates the company shall or ought to pay, is a question we are not at liberty to consider.

That the right conferred upon the supervisors might, in unscrupulous hands, be abused, is obvious. By successive reductions in the rates the property might be virtually confiscated, or its value so far impaired that the city might acquire it at a price practically fixed by

its own legislation. It would seem that the only remedy for so great a wrong is to be sought "at the polls."

But even if I am mistaken in the view I take of the principles laid down by the supreme court and of their controlling authority in this case, it is nevertheless obvious that in presence of a decision of the supreme court of this state affirming the constitutionality of article 14 of our constitution, and in view of the hesitation and embarrassment felt by the supreme court in coming to a decision upon the identical question now submitted to us, we cannot affirm the unconstitutionality of that article to be so clear and free from doubt as to authorize us to interpose in the manner prayed for in in the complaint.