SPRING VALLEY WATERWORKS v. CITY AND COUNTY OF SAN
FRANCISCO et al.

(Circuit Court, N. D. California. June 29, 1903.)

No. 13,395.

1. MUNICIPAL CORPORATIONS—DETERMINING VALIDITY OF ORDINANCE—SCOPE OF JUDICIAL INQUIRY.

The question whether an ordinance reducing the rates to be charged by a water company is in violation of the Constitution of the United States, as depriving the company of its property without due process of law, or as denying to it the equal protection of the laws, when presented to a court must be determined on an original, independent investigation, and without reference to the sufficiency of the evidence on which the action of the municipal body was based.

2. WATER COMPANIES—REGULATION OF RATES—CONSTITUTIONALITY OF ORDINANCE.

In determining whether rates to be charged by a water company, fixed by a municipality, are just and reasonable, and such as do not exceed the power to regulate such charges conferred by the Constitution and laws of California, or amount to a taking of the property of the company without due process of law, in violation of the Constitution of the United States, the basis of calculation is the reasonable value of the property necessarily employed in rendering the public service and the fair value of the service rendered; and in arriving at such property value the amount and value of the bonds and stock of the corporation, if not in excess of the real value of the property, may properly be considered.

8. SAME—ELEMENTS OF PROPERTY VALUE—FRANCHISE AND ESTABLISHED BUSINESS.

The franchise of a water company in California to collect rates for water supplied, which, by the Constitution of the state, is declared to be property, and made taxable as such, is an element to be considered in determining the value of the corporate property necessarily employed in the supplying of water to a city and county, city or town, or the inhabitants thereof, as is also the enhanced value of the property by reason of the fact that the company has an established business, and is a going concern actually using the property in supplying water to consumers.

4. SAME—REASONABLENESS OF RATES—ORDINANCE CONSIDERED.

An ordinance passed by the board of supervisors of the city and county of San Francisco, reducing the rates to be charged by a water company to private consumers, and under which, as shown by the proofs—resolving all doubtful questions against the company—its annual net earnings would not exceed 4 $40/100$ per cent. on the value of the property necessarily employed in the service, or 3 $30/100$ per cent. on its stock after deducting its fixed charges, held unconstitutional and invalid on a motion for a preliminary injunction, as fixing a rate so low as to be unreasonable and unjust, and which would amount to the taking of private property for public use without just compensation and without due process of law; and especially in view of expert testimony showing that the usual net income from capital invested in similar large corporations on the Pacific Coast is not less than 6 per cent., and of the state statute relating to the fixing of water rates in counties, which provides that they shall be so adjusted that the net annual receipts to the companies shall not be less than 6 nor more than 18 per cent. on the value of the property used.

5. CONSTITUTIONAL LAW—TAKING PROPERTY FOR PUBLIC USE—"JUST COMPENSATION."

"Just compensation," as used in Constitutions, means full compensation, and the taking of private property for public use for anything less is an invasion of constitutional rights, irrespective of the extent of the infringement.

¶ 5. See Eminent Domain, vol. 18, Cent. Dig. § 325.

6. INJUNCTION—PERSONS BOUND—SUIT AGAINST MUNICIPALITY.
> In a suit against a municipal corporation and its officers to enjoin the enforcement of an ordinance reducing the rates to be charged by a water company, the defendants represent the rate payers, who are bound by the proceedings and by an injunction issued therein.

In Equity. On motion for preliminary injunction.

Order to show cause why a preliminary injunction should not be granted restraining the city and county of San Francisco and its board of supervisors, and each of them, and all consumers of water in said city and county, during the pendency of this action and until its final determination, from bringing or causing to be brought any suit or action against the complainant, in law or in equity, to enforce a certain bill or ordinance passed by said board on March 9, 1903, or any suit or action against the complainant for the forfeiture of complainant's franchise, works, or property, or for any other purpose, on account of complainant's failure or refusal to conform to the rates prescribed by said bill or ordinance, and from any attempt or suit or action, directly or indirectly, to compel complainant to furnish water at any other rates than those which may be permitted by this court pending this litigation, or legally or reasonably fixed by said board of supervisors in obedience to any decree or mandate of this court in this action; and why the complainant should not, pending this litigation, be permitted by this court to collect rates for water supplied by it to said city and county of San Francisco and its inhabitants in accordance with the terms of a bill or ordinance passed by said board of supervisors on March 24, 1902, and now in force in relation to such rates.

M. B. Kellogg and Francis J. Heney, for complainant.
Franklin K. Lane, City Atty., and George W. Lane, for defendants.

MORROW, Circuit Judge (after stating the facts). The ground upon which the preliminary injunction is sought in this case is that the ordinance in question violates the Constitution of the United States by depriving complainant of its property without due process of law; that it takes complainant's property for public use without just compensation, and deprives complainant of the equal protection of the laws.

The complainant is a corporation incorporated under the laws of the state of California in the year 1858 for the purpose of supplying the city and county of San Francisco and its inhabitants with pure fresh water for domestic and other purposes. It is alleged in the bill of complaint that the company has complied with all the terms of the statutes of the state, and acquired the necessary lands, water rights, and reservoir sites in and in close proximity to the said city, and has from the time of its organization in 1858 down to the present time, as the city has grown in territorial extent, wealth, and commercial importance, and in necessary anticipation thereof, added to and increased, under the advice of the most able and competent engineers, its means and appliances for supplying water to the said city and its inhabitants, and has distributed the same by means of pipes laid underground through the streets of the city, keeping in view the continued growth of the city in extent and population, as well prospective as actual, its peculiar geographical position and climatic conditions, its great exposure to the dangers of fire and the necessity of providing for its requirements in advance of their occurrence, as well as the probable demand at any time for a very large supply of water to meet the contingency of contagious sickness, war, and the occurrence of a long

period of drought. It is alleged that it acquired all the property and water rights of the San Francisco Waterworks. in 1864; that the policy of the complainant is to have a storage capacity equaling at least a three-years supply, on account of the varying annual quantity of rain, which has been as low as 7.40 inches and as high as 50 inches, the average for the past 51 years having been about 25 inches, but the average for the last past 5 years previous to the winter season of 1902–1903 having been only 16.64 inches. It is alleged that complainant furnished:

| In the year 1865 | 865 | million gallons |
| " " " 1870 | 2,204 | " " |
| " " " 1875 | 4,266 | " " |
| " " " 1880 | 4,627 | " " |
| " " " 1885 | 6,223 | " " |
| " " " 1890 | 7,457 | " " |
| " " " 1895 | 7,264 | " " |
| " " " 1900 | 9,295 | " " |
| " " " 1901 | 9,736 | " " |
| " " 1902 | 10,101 | " " |

The bill of complaint describes the principal properties acquired by the complainant for the purpose of supplying water to the city and county of San Francisco and its inhabitants, including the ownership of nearly 20,000 acres of watershed lands in San Mateo county, on which four reservoir sites are situated; nine distributing reservoirs in the city and county of San Francisco; nine pumping stations (seven of which are in duplicate), having an aggregate capacity of 72,000,000 gallons daily or over, so located that they supply the high portions of the city with water under a first-class fire pressure up to 600 feet above tide, and are so arranged that the various districts can be supplemented when necessary; tunnels of an aggregate length of 35,141 feet, and the following pipe lines:

| 22 | miles of pipe 44 inches in diameter |
| 28½ | " " 36 " " |
| 22¾ | " " 30 " " |
| 1½ | " " 23 " " |
| 1¾ | " " 22 " " |

—Four hundred and ten miles of distributing pipes laid in the streets of the said city, by which water is supplied under great pressure to consumers for domestic and other uses, and to the government authorities of said city for the extinguishment of fires and the cleansing of sewers, for which last-mentioned purpose and for other municipal purposes the complainant has, at the request of the said city, erected and connected with said distributing pipes 3,939 hydrants in the streets of said city, which, on being opened, deliver water for the purposes aforesaid under enormous pressure (greater than that of any others in any of the large cities in the United States), in consequence of the height of the said distributing reservoirs above the streets whereon said hydrants are situated.

It is alleged that "all of the said reservoir sites, water rights, watersheds, and sources of supply have been purchased by the said complainant at prices much less than their present values, respectively, and the said reservoirs and other works have been erected and constructed as skillfully and economically as possible, under the direction of

engineers of the highest skill and learning, and without any useless or unnecessary outlay; and have been so purchased, prepared, and constructed for the sole purpose of supplying the said city of San Francisco and its inhabitants with water as aforesaid, and are not profitably applicable to any other purpose. Taken together, they constitute a system of water supply for a great city, absolutely unique in the world, and are not only ample for the needs of the city with its present population, but are capable of extension by the construction of additional dams and aqueducts, such as will store and supply sufficient water for the wants of more than 2,000,000 inhabitants and for a small expenditure, compared with the fundamental expenditures already made. The value of these properties already acquired for such extensions is not included in the value of the plant in use by complainant as hereinafter set forth. Taken together, they are reasonably worth over $50,000,000. In fact, if they had not, by the foresight of the complainant, been secured in advance of any visible actual necessity therefor, they would have been practically unattainable, not only on account of their largely increased value, but they would have been devoted to other uses, such as would have contaminated and unfitted them for domestic water sources. "That the said complainant has caused the actual cost of said waterworks to its stockholders, down to the 1st of January, 1903, to be carefully computed by competent accountants, on the basis of setting down the sums derived by it from sales of its stock, and contribution by stockholders, at the date of their respective payments, and adding thereto interest thereon at contemporary current rates down to the next succeeding 1st of January, and deducting therefrom dividends paid during the year, with interest thereon at the same rate from the time the same became payable down to the same date, and carrying forward the difference as a new balance; and, so computed, the actual cost of said works to the stockholders of the said complainant at the date aforesaid has been ascertained to be, and the complainant avers that the same has been and is, the sum of $36,256,235.70, whereof there were derived from sales of stock and invested earnings belonging to stockholders and interest as aforesaid, $22,281,235.70, and from sales of bonds $13,975,000."

The bill sets forth the rate of annual dividends complainant has divided with its stockholders from its organization in 1858, down to and including 1902, from which it appears that with the exception of six years, when no dividends were declared, the dividends have ranged from ⅗ of 1 per cent., in 1863, to 9 per cent. per annum in 1875 and 1876. The failure to declare dividends is explained by the bill in the allegation that for several years after its incorporation complainant divided none of its earnings among its stockholders, but reinvested the same in the increase and extension of its works.

It is further alleged that under the ordinance in controversy, adopted by the Board of Supervisors on March 9, 1903, the complainant verily believes that the dividends which complainant would be able to pay to stockholders for the fiscal year of July 1, 1903, to June 30, 1904, would not exceed 3.78 per cent. on the issued stock of the complainant, amounting to $14,000,000, no reference being had to the value of the property actually in use by complainant, which it is al-

124 F.—37

leged is largely in excess of $40,000,000. It is alleged that the ordinary rate of interest for money lent on first-class mortgages on city property was 24 per cent. per annum in 1858, from which rate the interest has declined to 6 per cent. during the past four years, except that in 1901 and 1902 a very few most desirable loans were made at a rate slightly below 6 per cent. It is alleged that the purposes of the incorporation of complainant were and are to supply said city and county and its inhabitants with pure fresh water; that the complainant has a franchise for that purpose, although it is not and never has been an exclusive franchise, and does not constitute and never has constituted a monopoly of the right to furnish water to said city and county and its inhabitants; that for many years last past the complainant has been, and is now, supplying the larger portion, or nearly all, of the fresh water consumed by said city and county and its inhabitants, and that there are no waterworks in said city and county, except those owned by complainant, capable of supplying all the water required by said city and county and its inhabitants, and that there are not, and were not at any of said times in this bill mentioned, any municipal or public waterworks in said city and county; that, in order to carry out the purposes of its incorporation, complainant has, since its incorporation, acquired reservoir sites, buildings, and reservoirs, and obtained riparian and other rights and properties necessary to secure the absolute ownership of water caught and impounded in its reservoirs, and has purchased water rights and has bought large tracts of land for the purpose of obtaining an adequate supply of pure fresh water and of preserving the same in good and potable condition, and has constructed aqueducts and pumping plants and other works, and has laid many miles of large water pipes for conveying the water to said city and county and distributing the same to its said consumers, and has purchased and acquired and owns other properties necessary and essential in the conduct of its business and the purposes of its incorporation; and that all said properties and rights above referred to have been and are now actually used and are necessary and essential in supplying said city and county and its inhabitants with pure fresh water, and that the aforesaid rights, lands, works, pipes, improvements, and properties are and were at all the times in the complaint mentioned of a value largely in excess of $40,000,000.

It is further alleged that, in order to procure funds required in acquiring water rights and other properties necessary in the conduct of its said business and in constructing its works and in making the improvements necessary and essential for the purposes of its incorporation, the complainant has, during the last 37 years, been compelled to borrow and has borrowed, in addition to funds furnished by its stockholders, large sums of money, amounting in the aggregate to more than $15,000,000, and that it has now an aggregate interest-bearing indebtedness secured by mortgages on its property of $13,975,000, and that the interest upon said mortgage indebtedness and other indebtedness which will accrue and will be necessary to be paid during the fiscal year ending June 30, 1904, will amount in the aggregate to not less than $708,500. And complainant alleges, upon its best information and belief, that during said fiscal year ending June 30, 1904,

the operating expenses of complainant which will actually and necessarily be incurred in operating its works in actual use for the purposes of its business and in carrying on its business will amount to the sum of at least $506,000; and that during the said fiscal year ending June 30, 1904, and before the expiration thereof, the complainant will be compelled to pay at least the sum of $286,000 as state and city and county and county and school taxes levied upon its property for that year.

It is further alleged that the amount of the issued capital stock of complainant is, and was at all the times hereinafter stated, $14,000,-000, divided into 140,000 shares of the par value of $100 each, and is owned and held by more than 1,800 shareholders; that for a long time prior to February, 1901, the actual or market value of said shares averaged about $97 per share, and that, but for the ordinances or bills of the board of supervisors of said city and county passed in April, 1901, and in February, 1902, and pretended to be passed in March, 1903, purporting to fix water rates, the actual market value of said stock would now be about $97 per share, but that the same is only about $83 to $85, by reason of the passage of said pretended ordinances, and particularly the ordinance pretended to be passed in March, 1903.

It is alleged that the usual rate of annual income or interest realized in said city and county for permanent investments in dividend-paying stocks of the character of the stock of complainant is not less than 6 per cent. per annum upon the par value thereof, and that the holders of the stock of complainant are justly and reasonably entitled to receive dividends upon their said stock at not less than 6 per cent. per annum upon the par value of said stock, and that the complainant is fairly entitled to have and receive as rates for water supplied by it to said city and county and its inhabitants an income which would realize at least 6 per cent. upon the actual value of the actual property in use in furnishing and supplying said water, and, in addition thereto, its annual operating expenses and the amount of taxes levied for state and city and county and county and school and other purposes, and an annual sum or per cent. for depreciation of its plant.

It is alleged in the bill that the ordinance of March 9, 1903, purports to fix rates to be charged for supplying water to the said city and county and its inhabitants for the fiscal year ending June 30, 1904, but that the same is null and void, and of no effect, and was adopted without due process of law. The bill sets out the proceedings under which it was pretended that the ordinance was passed, from which it appears that the chairman of the water rates committee of the board of supervisors made a minority report to the board, recommending the final passage of a bill providing for a horizontal reduction of 7 per cent. in fixed and meter rates of consumers other than shippers from the rates established by the ordinance then and now in force. The report contained a statement of the business of complainant for the year ending June 30, 1904, relating to its revenue, operating expenses, and taxes, and an estimate of the value of complainant's property in actual use. This report, it is alleged, was received and placed on file, and a bill was pretended to have been passed by said board by

a vote of 10 ayes to 5 noes, and was ordered numbered as Ordinance No. 661; but it is alleged upon information and belief that no bill in the premises was ever introduced or passed, and the particulars in which the proceedings are alleged to have been defective and void are set out. The answer of the defendants alleges the passage of a second ordinance, approved May 23, 1903. Obviously the purpose of the second ordinance was to cure the defects in the first ordinance, although it is not so stated in the answer. These two ordinances are substantially the same, and hereafter the ordinance in controversy will be designated as the "Ordinance of May 23, 1903." The reduction in rates provided in this ordinance is based upon the following statement, contained in the minority report of the chairman of the water rates committee:

"Schedule in Matter of Revenue of Spring Valley Waterworks, Prepared by Chairman of Water Committee.

| | | |
|---|---:|---:|
| Total amount estimated by the company they will receive from all sources during this fiscal year.......................... | | $1,998,906 19 |
| From the city ................................... | $133,236 30 | |
| From shipping ................................... | 83,000 00 | |
| From rents ..................................... | 47,012 50 | |
| | | 263,248 80 |
| Deduct this amount from gross receipts, and it gives the net revenue from rate payers other than shipping............... | | $1,735,657 39 |
| Add 5 per cent. for increase in business...................... | | 86,782 86 |
| | | $1,822,440 25 |
| Upon the reduction of 7 per cent., if made, which amounts to... | | 127,570 81 |
| The amount from rate payers after the 7 per cent. reduction.... | | $1,694,869 44 |
| To which we add the amount from city............ | $136,000 00 | |
| From shipping ................................... | 83,000 00 | |
| From rents ..................................... | 47,012 50 | |
| | | 266,012 50 |
| | | $1,960,881 94 |
| Amount allowed for operating expenses............ | $450,000 00 | |
| Amount allowed for taxes...................... | 242,000 00 | |
| | | 692,000 00 |
| Amount they will receive for interest.................... | | $1,268,881 94 |

It is alleged that the said pretended bill or ordinance is, and the rates purporting to be fixed thereby are, void, null, grossly unjust, unreasonable, unconstitutional under the said provisions of the Constitution of the United States, and oppressive and confiscatory; that said rates do not permit of or provide for just or fair or reasonable compensation for water to be supplied during said year by complainant or any other person to said city and county and its inhabitants, and that, if said pretended bill or ordinance is enforced in its terms and their effect, complainant's gross income for said fiscal year therefrom (after deducting operating expenses and taxes) will, according to complainant's best information and belief, be less than $1,000,000, and will be wholly insufficient to pay the operating expenses of complainant and taxes upon and in reference to property of complainant actually in use in such supply, and any reasonable income or interest

upon the actual value of the property of complainant in actual use in supplying said city and county of San Francisco and its inhabitants with water, or any greater income or interest upon said actual value than the rate of 2½ per cent. per annum, according to complainant's best information and belief.

The bill alleges certain particulars in which the ordinance is unjust and unreasonable, and specifies wherein the rates do not permit of or provide for just or fair or reasonable compensation. Among other particulars, it is alleged that the board willfully and arbitrarily allowed the complainant only the sum of $450,000 for operating expenses, whereas the truth and the fact is alleged to be that the operating expenses for the said fiscal year will, according to the best information and belief of the complainant, amount to the sum of $506,000; that said sum is reasonable, and was by complainant so proven to said board by sworn and undisputed testimony; and that by said deduction the board arbitrarily, unfairly, and unjustly reduced the income of complainant upon the actual value of its plant in use in supplying water the sum of $56,000 below the amount which the board had in the first place determined was the reasonable amount of such income. It is also alleged that the taxes levied upon the property of complainant for the fiscal year 1902–1903 were the sum of $239,537.05; that since such levy the property of complainant has been added to by the expenditure of more than the sum of $730,000, and that without any other or different evidence or statements whatever, except as to the amount of taxes which would in all probability be levied against complainant for the fiscal year 1903-1904, the said board willfully and arbitrarily fixed the amount to be allowed complainant for taxes for state and city and county and county taxes at the sum of $242,000, which sum it is alleged is less by the sum of $44,390 than the state and city and county and county taxes which will be levied, according to the best of complainant's knowledge, information, and belief, upon the property of complainant, and thereby again reduced the income upon the actual value of the property actually used by complainant in so supplying water by the further sum of $44,390 below the amount which the said board determined was a reasonable income. It is further alleged that in passing the bill or ordinance in question, and in fixing the rates therein set forth, the said board refused and omitted to allow to complainant, either as part of its operating expenses, or otherwise, or at all, any sum or amount whatever as a rate or part of a rate or compensation for depreciation from natural causes resulting by use or ordinary wear of any part of the property actually employed in so supplying water, or to take such depreciation into consideration at all in fixing said rates; that a large part of the said property is subject to annual depreciation by natural causes resulting from use and ordinary wear; and that such refusal was unjust, inequitable, oppressive, and illegal, and greatly to the damage and injury of complainant. It is alleged that the issues in the case involve federal questions; that the enforcement of the ordinance will abridge the privileges and immunities of the complainant, will deprive the complainant of its property without due process of law, and will deny to the complainant the equal protection of the law; and that the matter involved exceeds, exclusive of interest and costs, the sum of $2,000.

In the answer to the order to show cause the defendants have ap-, peared, and by affidavits have introduced in evidence: The ordinances of the board of supervisors fixing water rates from the year 1889 to and including the fiscal year ending June 30, 1903. Transcripts of the proceedings of the board of supervisors, and papers relating to the passage of the ordinances of March 9, 1903, and May 23, 1903. Copies of certain documents submitted to said board in connection with the investigation conducted by said board with respect to water rates for the fiscal year ending June 30, 1904. The affidavit of A. B. Thompson, an expert accountant, who avers that he has examined the books of account of the complainant, and has found that the entire tangible assets of the company are $24,111,974.36, and no more, and that the outstanding floating indebtedness of the complainant is $1,-002,180.15. The affidavit of Harry Schwartz, secretary of the Stock and Bond Exchange of San Francisco, containing a statement of the official monthly high and low quotations of the Spring Valley Waterworks stock from January, 1899, to April, 1903. From this statement it appears that the stock sold in 1899 at, highest, $103, lowest, $92; in 1900, highest, $99.25, lowest, $90⅞; in 1901, highest, $94¾, lowest, $82; in 1902, highest, $93½, lowest, $83¼; in 1903, highest, $88⅛, lowest, $83. The affidavit of James D. Phelan, president of the Mutual Savings Bank of San Francisco, in which affiant says he is familiar with the investment of capital in quasi public corporations; that the usual and customary net income from such investments, in cases where the corporations are judiciously managed, is between 4 and 5 per cent. annually on total investments of $10,000,000 and upwards; that the usual and actual income of capital invested in first-class improved real estate in the city and county of San Francisco, when such investment amounts to $1,000,000, is between 4 and 5 per cent. annually. The affidavits of W. H. Kline and Charles W. Fay as to rate of taxation and assessed valuation of complainant's property in San Francisco and various other localities. The defendants have also filed their answer, consisting mainly of literal denials of the material allegations of the bill of complaint. This answer will be accepted as a pleading, but under the equity practice prevailing in this court, the denials cannot be considered as evidence in favor of the defendants.

The complainant has introduced in evidence, in rebuttal, the affidavit of Pelham W. Ames, secretary of the complainant, who avers that as such secretary he has charge of the books of account of the corporation; that the total cost of the entire assets of said corporation, as shown by its books of account, is the sum of $36,256,235.78, and upwards. Another affidavit of Pelham W. Ames is introduced, in which he stated the bonded indebtedness of the complainant on the 9th day of March, 1903, to be as follows:

First mortgage bonds, drawing interest at the rate of 6 per cent. per annum .......................................... $ 4,975,000
Second mortgage bonds, drawing interest at the rate of 4 per cent. per annum ........................................ 5,000,000
Third mortgage bonds, drawing interest at the rate of 4 per cent. per annum ........................................ 4,000,000

Total ................................................. $13,975,000

—And, in addition thereto, the following floating or unsecured indebtedness: $492,500, drawing 6 per cent. interest per annum, and $525,000, drawing 5 per cent. interest per annum.

The complainant has also introduced in evidence the affidavit of Daniel Meyer, who states that for the last 43 years he has been engaged in the banking business, and is and has been for that time familiar with the income yielded by investments of large amounts of capital on the Pacific Coast; that the usual and customary net income from investments of capital in corporations, where judiciously managed, is not less than 6 per cent. per annum, and that, in his opinion, capital could not be obtained for investment in the business of a quasi public corporation unless a net income of at least 6 per cent. per annum could reasonably be assured. Also, the affidavit of William Alvord, president of the Bank of California, of this city, who states that he has been engaged in the banking business for 25 years, and that the usual net income from investments of capital in corporations, where judiciously managed, is not less than 7 per cent. per annum; that, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of from 8 to 10 per cent. per annum could be reasonably assured. The affidavit of John Lloyd, president of the German Savings & Loan Society, states that he has been engaged in the banking business for the last five years, and has been familiar with the income yielded by investments of large capital on the Pacific Coast for the past 20 years; that such income is usually not less than 6 per cent. per annum net; and, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of from 6 to 7 per cent. per annum could be reasonably assured. The affidavit of George Tourny, secretary of the German Savings & Loan Society, states that he has been engaged in the banking business for 25 years; that, in his opinion, large amounts of capital could not be obtained for the business of a quasi public corporation unless a net income of from 6 to 7 per cent. per annum could be reasonably assured. The affidavit of H. Wadsworth, cashier of Wells, Fargo & Company's Bank, states that he has been engaged in the banking business for the last 27 years, and for the last 30 years has been familiar with the income yielded by investments of large amounts of capital on the Pacific Coast; that the usual net income from investments of capital in corporations, where they are judiciously managed, is not less than 7 per cent. per annum; and that, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of from 8 to 10 per cent. per annum could be reasonably assured. The affidavit of W. H. Crocker, president of the Crocker-Woolworth National Bank of San Francisco, states that he has been engaged in the business of banking for the last 20 years, and is familiar with the usual income yielded by investments of large capital on the Pacific Coast; that such income is not less than 6 to 7 per cent. per annum, net, from investments of capital in corporations where judiciously managed; and, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of at least 6 per cent. per annum could be reasonably assured. The affidavit of Frederick W. Zeile, president of the

Mercantile Trust Company of San Francisco, states that he has been engaged in the banking business for the last four years; that the usual net income from investments of capital in corporations, where judiciously managed, is not less than 6 per cent. per annum, and, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of 6 per cent. per annum could be reasonably assured. The affidavit of Adam Grant, a merchant, and a director of the Bank of California, states that he has been engaged in the banking business for the last 40 years; that the usual net income yielded by investments of capital in corporations, where judiciously managed, is not less than 7 to 8 per cent. per annum, and, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of at least 7 to 8 per cent. per annum could be reasonably assured. The affidavit of Charles Sutro states that for the last 15 years he has been engaged in the business of a stockbroker, and is familiar with the income yielded by investments of large amounts of capital on the Pacific Coast; that such income is not less than 7 to 8 per cent. per annum net, and, in his opinion, capital could not be obtained for the business of a quasi public corporation unless a net income of 8 per cent. per annum could be reasonably assured. The affidavit of H. Schussler, chief engineer of the complainant, sets forth in detail the value, location, and character of complainant's property, excluding its water rights and franchises, and including, among other things, its reservoir sites, watersheds, filter beds, head works, conduits, and distributing systems, which are at the present time used in distributing water to the city and county of San Francisco and its inhabitants, and stating the total valuation of these various properties to be $34,718,600.

It is not the province of the court to review the evidence upon which the board of supervisors acted in adopting the ordinance under consideration. Whether the ordinance deprives the complainant of its property without due process of law, denies to it the equal protection of the laws, or abridges the privileges and immunities of the complainant, are questions to be determined by the court in this action upon an original independent investigation, and not by an examination of the proceedings of the board to ascertain what evidence it received and acted upon, and whether that evidence was sufficient to justify the conclusion reached. This does not mean that the same evidence submitted to the board may not be submitted to the court, as appears to have been done in this case; and, if the evidence is competent and relevant to the issues before the court, it will be considered. But it does not follow that, because the board may have received evidence that the court would have rejected, or has rejected evidence the court would have received, the proceedings of the board are to be regarded as illegal, and the ordinance as depriving complainant of constitutional rights. So with respect to the proceedings of the board in determining the value of complainant's property in actual use, and the necessary expense that will be incurred in keeping it in operation, elements may have been considered by the board that should have been omitted, and elements omitted that should have been considered, and still the ordinance be, in effect, just and constitutional.

As said by the Supreme Court of the United States in the recent case of San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892:

"We do not sit as a general appellate board of revision for all rates and taxes in the United States. We stop with considering whether it clearly appears that the Constitution of the United States has been infringed, together with such collateral questions as may be incidental to our jurisdiction over that one."

In San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261, Mr. Justice Van Fleet declared the province of the court in such a case very clearly when he said:

"The function of the courts is merely to ascertain whether the power had been carried beyond the constitutional limits so fixed; and, if such be found to be the case, to declare the acts of the council void. They do not sit as appellate tribunals to review the correctness of the council's determination, nor need they know anything about the evidence upon which that body has acted. All they have to consider is whether, in a given case, the result of the council's action will be to take the property of the complaining party without just compensation. That is a mixed question of fact and law, to be decided by the court upon the evidence produced before it."

The scope of judicial inquiry for the purpose of determining the limitations imposed by the Constitution of the United States upon legislative authority in cases of this character has been the subject of elaborate discussion for more than a quarter of a century; and, while some of the most difficult and vexatious problems remain undetermined, certain principles of constitutional law have been settled, to which reference should be had before proceeding to consider the questions at issue in this case. In the recent case of Cotting v. Kansas City Stock Yards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, the Supreme Court of the United States reviewed the decisions of that court upon this subject, and indicated the extent to which the court had gone. It said that as to those individuals and corporations who have devoted their property to a use in which the public had an interest, although not engaged in a work of a confessedly public character, there had been no further ruling than that the state may prescribe and enforce reasonable charges, and that with respect to parties engaged in performing a public service, while the power to regulate had been sustained, negatively the court had held that the Legislature might not prescribe rates which, if enforced, would amount to a confiscation of property. It was said, further, that the court had not held affirmatively that the Legislature might enforce rates which stop only this side of confiscation, and leave the property in the hands and under the care of the owners without any remuneration for its use; but it has "declared that the present value of the property is the basis by which the test of reasonableness is to be determined, although the actual cost is to be considered, and that the value of the services rendered to each individual is also to be considered. It has also ruled that the determination of the Legislature is to be presumed to be just, and must be upheld, unless it clearly appears to result in enforcing unreasonable and unjust rates."

In the late case of San Diego Land & Town Co. v. Jasper, which was a water rate case from this state, the court said further: "It no

longer is open to dispute that under the Constitution what the company is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public;" citing San Diego Land & Town Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 43 L. Ed. 1154—another water rate case from this state.

The important feature of these cases is the declaration that the Supreme Court of the United States has ruled (1) that individuals and corporations engaged in performing a public service are entitled to have just compensation for the use of their property employed in such service, and (2) that the determination of the Legislature is to be presumed to be just and must be upheld, unless it clearly appears to result in enforcing unreasonable and unjust rates. The first inquiry must therefore be, what has the Legislature determined upon the subject? and this inquiry must extend, not only to the acts of the local legislature, or board of supervisors, authorized to fix rates for the public service in a particular locality, but to the acts of the state Legislature authorized to enact general laws under the Constitution of the state. In prosecuting this inquiry in the present case, what do we find?

The complainant was incorporated on the 19th day of June, 1858, under the general act of the Legislature passed April 22, 1858, providing for the incorporation of water companies. St. 1858, p. 218, c. 262. The present Constitution was adopted in 1879, and upon going into effect on January 1, 1880, the complainant became subject to its provisions. Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173. Under the Constitution, the complainant, in supplying water to the city and county of San Francisco and its inhabitants, is performing a public service, and is subject to all the limitations and entitled to all the rights pertaining to that service. In article 14 of the Constitution, relating to water and water rights, it is provided in section 1:

"The use of all water now appropriated or that may hereafter be appropriated for sale, rental, or distribution, is hereby declared to be a public use and subject to the regulation and control of the state in the manner to be prescribed by law."

The remainder of the section provides in general terms for the procedure of fixing water rates by the board of supervisors, or city and county, or city or town council. Section 2 provides:

"The right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

To carry these provisions of the Constitution into effect, the Legislature has passed two acts. The first, approved March 7, 1881 (St. 1881, p. 54, c. 52), prescribes in more detail than the Constitution the method of procedure to be followed by the board of supervisors, town council, board of aldermen, or other legislative body in fixing the water rates that shall be charged and collected by any person, company, association, or corporation for water furnished to any city and county, or city, or town, or the inhabitants thereof. It provides for

an annual statement to be made by water companies under oath, showing the name of each water rate payer and the amount paid for water by each water rate payer during the year preceding the date of such statement, and also showing all revenue derived from all sources, and an itemized statement of expenditures made for supplying water during said time. The water company is also required to furnish a detailed statement, verified in like manner, showing the amount of money actually expended annually since commencing business in the purchase, construction, and maintenance, respectively, of the property necessary to the carrying on of its business, and also the gross cash receipts annually for the same period from all sources. The second act was approved March 12, 1885 (St. 1885, p. 95, c. 115), and is entitled "An act to regulate and control the sale, rental, and distribution of appropriated water in this state, other than in any city, city and county, or town therein, and to secure the rights of way for the conveyance of such water to the places of use." It provides a method of procedure to be followed by the board of supervisors of the state in fixing water rates for the sale, rental, or distribution of appropriated water to the inhabitants of the several counties, and among other things it provides:

"Said boards of supervisors, in fixing such rates, shall, as near as may be, so adjust them that the net annual receipts and profits thereof to the said persons, companies, associations, and corporations so furnishing such water to such inhabitants, shall be not less than six nor more than eighteen per cent. upon the said value of the canals, ditches, flumes, chutes, and all other property actually used and useful to the appropriation and furnishing of such water of each of such persons, companies, associations, and corporations; but in estimating such net receipts and profits, the cost of any extensions, enlargements, or other permanent improvements of such water-rights or water-works shall not be included as part of the said expenses of management, repairs, and operating of such works, but when accomplished, may and shall be included in the present cost and cash value of such work. In fixing said rates, within the limits aforesaid, at which water shall be so furnished as to each of such persons, companies, associations, and corporations, each of said board of supervisors may likewise take into estimation any and all other facts, circumstances, and conditions pertinent thereto, to the end and purpose that said rates shall be equal, reasonable, and just, both to such persons, companies, associations, and corporations, and to said inhabitants." St. 1885, p. 96, c. 115, § 5.

It will be observed that the first act provides no limitation upon the amount of net annual receipts and profits which the persons, companies, associations, and corporations may derive from the business of supplying water to the cities and towns and the inhabitants thereof, but in the last act the net receipts for water furnished to the inhabitants of a county are limited to not less than 6 nor more than 18 per cent. upon the value of all the property actually used and useful to the appropriation and furnishing of such water. But the first act has been the subject of judicial construction by the Supreme Court of the state, and the limitations there determined and declared have become as much a law of the state, and binding on this court, as though written into the statute books. The first case was that of Spring Valley Waterworks v. San Francisco, 82 Cal. 286, 22 Pac. 910, 6 L. R. A. 756, 16 Am. St. Rep. 116. That action was brought by the complainant in this case to set aside and declare void an ordi-

nance of the board of supervisors of the city and county of San Francisco fixing water rates to be charged for water to be furnished to the city and its inhabitants for the year commencing July 1, 1889. The plaintiff alleged that the value of its property at that time exceeded the sum of $25,000,000. It was objected to the ordinance, among other things, that the rates prescribed and fixed thereby were grossly unjust, unreasonable, and oppressive, and did not provide a just or fair or reasonable compensation for the water to be supplied under the provisions of the ordinance. The judgment of the lower court was entered upon demurrer, declaring the ordinance void, enjoining its enforcement, and directing the board of supervisors to fix rates giving just compensation. This judgment was affirmed by the Supreme Court of the state. In the course of its opinion, the Supreme Court said:

"When the Constitution provides for the fixing of rates or compensation, it means reasonable rates and just compensation. To fix such rates and compensation is the duty and within the jurisdiction of the board. To fix rates not reasonable or compensation not just is a plain violation of duty."

It is true the court, in the further discussion of the question, said:

"But the courts cannot, after the board has fully and fairly investigated and acted by fixing what it believes to be reasonable rates, step in and say its action shall be set aside and nullified, because the courts, upon a similar investigation, have come to a different conclusion as to the reasonableness of the rates fixed. There must be actual fraud in fixing the rates, or they must be so palpably and grossly unreasonable and unjust as to amount to the same thing."

These last observations of the court were directed to certain allegations of the plaintiff (admitted by the demurrer to be true), wherein it was alleged and charged that the ordinance was passed without notice or opportunity to be heard; that the rates purporting to be fixed by the ordinance or order were fixed absolutely at random and by mere guesswork, without any regard to or consideration for the right of the plaintiff to a reasonable compensation for supplying water to the said city and county and its inhabitants, or to a reasonable income or any income upon its investment, and without any consideration of or regard to the value of the plaintiff's works and property, or the amount of its interest-bearing indebtedness and the annual interest charge thereon, or its operating expenses, or the amount of taxes which it would be required to pay, or the right of the plaintiff's stockholders to reasonable or any dividends upon their stock, and without any reference to or consideration of the actual cost of supplying said water, but in total disregard of all such matters. The language of the court last quoted was plainly directed against the failure of the board of supervisors in that case to fix rates in the manner provided by law, but further than this the opinion cannot be considered as declaring that, if it appears that the legislative body has proceeded according to the forms of law, the court will not inquire whether an ordinance deprives a person or corporation of constitutional rights, unless there is actual fraud in fixing rates, or that the rates fixed are so palpably and grossly unreasonable and unjust as to amount to the same thing.

In nearly all of these cases two questions are presented to the court for consideration:  First. Has the state or local authority, in fixing rates, acted arbitrarily, without investigation, and without the exercise of judgment or discretion, as required by law, thereby depriving the complainant of property without due process of law? Second. Are the rates as fixed so low as to amount to the taking of property without just compensation?  In discussing these two questions, the facts of the particular case are often of such a character that both questions are answered in one general line of argument, by which the court reaches a conclusion that the complainant has or has not been deprived of property without due process of law, and that property has or has not been taken without just compensation. The fact remains, however, that the single question of just compensation may be the only one to be determined; and while, in the present case, the bill of complaint challenges the legality of the ordinance by reason of defective procedure of the board of supervisors, and alleges that complainant's property is being taken without due process of law, and that complainant is being deprived of the equal protection of the laws, it is convenient to determine at this stage of the inquiry what, if any, limitations have been placed upon the power of the board of supervisors by the laws of the state to fix rates for this character of public service.  The complainant having undertaken to do that which is a proper work for the state, and having accepted the conditions of public service which attach to like service performed by the state itself, it becomes important to know what conditions the state has imposed upon this service.

The case of San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261, is a most carefully considered and instructive case upon this subject.  The common council of the city of San Diego had passed an ordinance fixing water rates for the year beginning July 1, 1891.  The water company brought suit against the city, the common council, the mayor, and the individual members of the council, to annul the ordinance and enjoin its enforcement.  The complaint alleged, in substance, that the entire revenue the water company could receive during the year in question, under the rates so fixed, would be insufficient to pay its operating expenses and fixed charges for that year, and would, therefore, afford no reward whatever to the company for furnishing the water, and that the ordinance would deprive the company of its property without due process of law, and without compensation.  It was also alleged that by reason of certain fraudulent practice on the part of the council the company was deprived of a fair opportunity to be heard before the council, and prevented from properly presenting its side of the case.  In discussing the question whether the rates fixed by the board of supervisors were just and reasonable, Mr. Justice Van Fleet, speaking for himself and Justices Henshaw and McFarland, said:

"Whether the fixing of rates by the council be called a legislative, judicial, or an administrative act, it is certainly not an adversary judicial proceeding, such as, under the Constitution, will conclude private rights.  It is a proceeding on the part of the government to which neither the water company nor the rate payers are parties, conducted without notice to them, and without

any right on their part to effectually intervene. Such a proceeding cannot operate to divest private rights; and, though the Supreme Court of the United States holds it to be a legitimate exercise of governmental powers, that court also holds that, when it is carried so far as to deprive anyone of his property without just compensation, it is an unlawful exercise of such power, and simply void. The function of the courts is merely to ascertain whether the power has been carried beyond the constitutional limits so fixed, and, if such be found to be the case, to declare the acts of the council void."

Referring to the constitutional provision of the state relating to water rights, the court said:

"The meaning of the section is that the governing body of the municipality, upon a fair investigation, and with the exercise of judgment and discretion, shall fix reasonable rates and allow just compensation. If they attempt to act arbitrarily, without investigation, or without the exercise of judgment and discretion, or if they fix rates so palpably unreasonable and unjust as to amount to arbitrary action, they violate their duty, and go beyond the powers conferred upon them. Such was the conclusion reached by this court in Spring Valley Waterworks v. San Francisco, 82 Cal. 286, 22 Pac. 910, 6 L. R. A. 756, 16 Am. St. Rep. 116, to which conclusion we adhere. Although that case was decided without the light cast on the subject by later decisions of the Supreme Court of the United States, and contains some observations which perhaps may require modification, we are satisfied with the correctness of the conclusion [construction] there given to this section of the Constitution."

The court continues:

"It is apparent that the water company does not own the water which it collects and supplies, or the plant which it uses to collect and distribute that water, in the same sense in which a man is said to own his house or his farm. By the very nature of the use to which it is applied, the company has devoted that property to a public use. Having once undertaken to perform that public duty, it must continue to perform it, and must carry on its business under the lawful regulations of the government. In effect, the state may be said to have appropriated the water and the plant to public use. For that appropriation it is bound to make just compensation, and it has provided for such compensation by requiring the municipal authorities to fix just and reasonable rates at which the water is to be furnished to and received by the consumers. Since the state has 'taken' the use of this property, it is bound to provide a just compensation for that use, and article 14 of the Constitution must be construed as providing for that just compensation. The question of what is just compensation in such a case is, we think, in all respects analogous to the question which arises in every case of appropriation under the power of eminent domain; and it may be reduced to the formula that the public must pay the actual value of that which it appropriates to the public use."

Chief Justice Beatty, dissenting with respect to certain questions, expressed views in harmony with those of Mr. Justice Van Fleet upon this subject. He said:

"In fixing water rates, it is the duty of the city council to provide for a just and reasonable compensation to the water company. Anything short of that is simple confiscation, and is not only a violation of constitutional rights, but is an extremely short-sighted policy. Rates ought to be adjusted to the value of the service rendered, and this means that the water companies should be allowed to collect annually a gross income sufficient to pay current expenses, maintain the necessary plant in a state of efficiency, and declare a dividend to stockholders equal to at least the lowest current rates of interest, not on the par or market value of the stock, but on the actual value of the property necessarily used in providing and distributing the water to consumers."

The effect of this decision is to declare it to be the law of this state that the public service in which complainant is engaged is not required to be performed without reward; that the state has, by operation of law, appropriated to public use the water distributed by the complainant and the plant used in its distribution, and for this appropriation from year to year the defendants will be required to make just compensation. What this just compensation should be is the difficult question to be determined. It will be presumed, as declared by the Supreme Court of the United States, that the rates fixed by the board of supervisors are just and reasonable, and will be upheld, unless it clearly appears that they will result in taking complainant's property without just compensation. This question cannot be finally determined in this case upon this hearing, but, for the purposes of this motion, the court must ascertain from the evidence before it what the complainant will probably be able to establish on the final hearing.

In this inquiry the important question is the basis upon which just compensation is to be determined. It may be considered as established that it is the reasonable value of the property at the time it is being used for the public service, but how this value is to be ascertained, and what elements are to be included in the estimate, are still subjects of controversy. In the case of San Diego Water Co. v. San Diego, supra, it was held that bonded indebtedness was to be disregarded. But this was said with reference to the findings in that case. The court below had found as facts: (1) That the water plant and system of the water company at the time the ordinance was enacted was of the value of $750,000. (2) That the cost of the plant and property of the water company necessary to furnish and supply the water to said city and its inhabitants at the time of the enactment of the ordinance was $750,000. (3) That the reasonable and necessary operating expenses of the water company in managing and conducting its said property and plant for the year, and the amount actually expended for that purpose, was $40,000. (4) That at the time the ordinance was enacted the water company was indebted upon its outstanding bonds regularly issued in the sum of $1,000,000, bearing interest at 5 per cent. per annum, of which sum $750,000 was necessarily expended in the construction of the plant, and the interest upon which ($1,000,000) was $50,000 per annum. In connection with findings covering specifically valuation and operating expenses, it is clear that an additional finding as to the bonded indebtedness and the interest on the same had no place as separate and distinct elements of valuation or just compensation. In the case of Redlands, etc., Water Co. v. Redlands, 121 Cal. 365, 53 Pac. 843, the San Diego Case was cited, and the principles there announced deemed applicable to the later case. It was accordingly held that, for the purpose of fixing rates to be charged for collecting and furnishing water to the inhabitants of a city, provision should not be made for the bonded or other indebtedness of the company, or of the interest thereon, but that the fair value of the property necessarily used in furnishing the water was the basis upon which to determine the amount of revenue to be provided by the ordinance fixing rates, and that this basis should be the

same whether the works were acquired or constructed by the company with its own resources or with money borrowed from others. It was further said that the amount of the capital stock paid into the water company by its stockholders, and the amount of its bonded and floating indebtedness and the interest thereon, were immaterial factors in the question of reasonableness of rates. But in this case there was no averment in the complaint as to the value of the plant, and no showing before the court as to what this value was; and manifestly neither the amount of the capital stock nor the amount of the bonded indebtedness could supply this omission, and the conclusion which the court reached was that, as the value of the plant was the basis upon which the court was to determine the sufficiency of the compensation, it was essential to present that fact to the court before the water company was entitled to a judgment that the rates were unreasonable. But neither of these cases go to the extent of holding that in determining the value of the property of a corporation neither the capital stock nor bonded indebtedness can be considered. It is doubtless true that in many cases these elements may be excessive or fictitious, and represent speculative, rather than real or substantial, values. But there may be cases where both stock and bonds represent in the market a present actual value in the property of the corporation, and a value that could not be otherwise very well established. In such a case, what objection can there be to giving the evidence such consideration as, under all the circumstances, it deserves? It seems to me there can be none, and such seems to be the opinion of the Supreme Court of the United States.

In San Diego Land Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, one of the questions sought to be determined in the action was the right of the water company to charge and collect for so-called "water rights" at reasonable rates as a condition upon which the company would furnish water for the purposes of irrigation, notwithstanding the rates fixed by the trustees of National City for water sold and furnished. Another question was whether the losses to the water company arising from the distribution of water to consumers outside of the city were to be considered in fixing the rates for consumers within the city. The water company contended, with respect to these two questions, that in ascertaining what were just rates the court should take into consideration the cost of the plant; the cost per annum of operating the plant, including interest paid or money borrowed and reasonably necessary to be used in constructing the same; the annual depreciation of the plant from natural causes resulting from its use; and a fair profit to the company over and above such charges for its services in supplying the water to consumers, either by way of interest on the money it had expended for the public use, or upon some other fair and equitable basis. In answer to this contention the court said:

"Undoubtedly, all these matters ought to be taken into consideration, and such weight be given them, when rates are being fixed, as, under all the circumstances, will be just to the company and to the public. The basis of calculation suggested by the appellant is, however, defective in not requiring the real value of the property and the fair value in themselves of the services rendered to be taken into consideration. What the company is entitled to

demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public. The property may have cost more than it ought to have cost, and its outstanding bonds for money borrowed and which went into the plant may be in excess of the real value of the property. So that it cannot be said that the amount of such bonds should in every case control the question of rates, although it may be an element in the inquiry as to what is, all the circumstances considered, just, both to the company and to the public."

The court also cited the previous case of Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, a railroad rate case, and held that the principles of that case were applicable to the water case; citing the following from the former decision:

"The basis of all calculation as to the reasonableness of rates to be charged a corporation maintaining a highway under legislative sanction must be the fair value of the property used by it for the convenience of the public. And in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the amount and market value of its stock and bonds, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

It follows that in determining the value of corporate property the amount and value of the bonds and stock, if not in excess of the real value of the property, may be considered.

The complainant contends that an element of value in its corporate property is its franchise. Section 2 of article 14 of the Constitution of the state provides:

"The right to collect rates or compensation for the use of waters supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law."

The Constitution also provides, in section 1 of article 13, that all property in the state not exempt under the laws of the United States shall be taxed in proportion to its value, to be ascertained as provided by law; and franchises are declared to be property. Under this constitutional provision and the law passed to carry it into effect, the complainant's franchise is taxed by the city and county of San Francisco at a valuation of $5,395,233. The defendants claim that this franchise has no element of value as property in use by the complainant in supplying water to the city and county of San Francisco and its inhabitants. This claim appears to be based upon an observation made by Mr. Justice Temple in San Diego Water Co. v. San Diego, supra, that:

"There is no limit to the number of companies which may bring water into the city. The franchise is freely offered to all in the Constitution. If there are many companies, and thereby the cost of management is increased, this fact would not call for increased rates. The service is worth no more when rendered by ten companies than when one company furnishes all the water."

This observation does not appear to have been concurred in by the other members of the court, and it is doubtful if it can be accepted as disposing of the question.

The case of Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463, was a condemnation proceeding in the Circuit Court of the United States for the Western District of Pennsylvania, under an act of Congress providing for the condemnation of a lock and dam in the Monongahela river. It was provided in the act that "in estimating the sum to be paid by the United States the franchise of the said corporation to collect tolls shall not be considered or estimated." 25 Stat. 411. Upon the trial in the Circuit Court evidence of the value of the franchise was rejected. In the Supreme Court the correctness of this ruling was considered, and upon this question the court said:

"The power to regulate commerce is not given in any broader terms than to establish post offices and post roads, but, if Congress wishes to take private property upon which to build a post office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor. And if that property be improved under authority of a charter granted by the state, with a franchise to take tolls for the use of the improvement, in order to determine the just compensation such franchise must be taken into account. Because Congress has power to take the property, it does not follow that it may destroy the franchise without compensation. Whatever be the true value of that which it takes from the individual owner must be paid to him before it can be said that just compensation for the property has been made. And that which is true in respect to a condemnation of property for a post office is equally true when condemnation is sought for the purpose of improving a natural highway. Suppose, in the improvement of a navigable stream, it was deemed essential to construct a canal with locks, in order to pass around rapids or falls. Of the power of Congress to condemn whatever land may be necessary for such canal there can be no question, and of the equal necessity of paying full compensation for all private property taken there can be as little doubt. If a man's house must be taken, that must be paid for; and if the property is held and improved under a franchise from the state, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken. So, coming to the case before us, while the power of Congress to take this property is unquestionable, yet the power to take is subject to the constitutional limitation of just compensation. * * * The theory of the government seems to be that the right of the navigation company to have its property in the river and the franchises given by the state to take tolls for the use thereof are conditional only, and that whenever the government, in the exercise of its supreme power, assumes control of the river, it destroys both the right of the company to have its property there and the franchise to take tolls. But this is a misconception. The franchise is a vested right. The state has power to grant it. It may retake it, as it may take other private property, for public uses, upon the payment of just compensation. A like, though a superior, power exists in the national government. It may take it for public purposes, and take it even against the will of the state; but it can no more take the franchise which the state has given than it can any private property belonging to an individual."

It is true this was a condemnation proceeding, and the question was to determine what was just compensation for the appropriation of corporate property to a public use, while the case before this court relates to the fixing of water rates which shall be a just compensation for the appropriation of complainant's property to a public use. It is not perceived that there is any difference in the principles ap-

plicable to the two cases, and this appears to have been the view of the Supreme Court in San Diego Water Co. v. San Diego, supra.

The complainant next contends that it has an established business as a water company and as a going concern in supplying water to consumers, and that its plant has a value by reason of these advantages beyond the mere cost of reproducing the plant. In support of this view the complainant cites the case of National Waterworks Co. v. Kansas City, 62 Fed. 853, 10 C. C. A. 653, 27 L. R. A. 827. The opinion is by Mr. Justice Brewer of the Supreme Court. On page 865 he says:

"A completed system of waterworks, such as the company has, without a single connection between the pipes and the streets and the buildings of the city, would be a property of much less value than that system connected, as it is, with so many buildings, and earning, in consequence thereof, the money which it does earn. The fact that it is a system in operation, not only with a capacity to supply the city, but actually supplying many buildings in the city—not only with a capacity to earn, but actually earning—makes it true that 'the fair and equitable value' is something in excess of the cost of reproduction."

This was also a condemnation proceeding, but, as before stated, the principles of compensation applicable to such a case appear to be applicable to the present case.

The principles of just compensation established by the courts in the several cases they have had under consideration are of great assistance in solving many of the difficult questions involved in this character of litigation; but the application of these principles to the facts of a particular case is, after all, the simple rule of determining what, under all the circumstances, is reasonable and just as between the rate payers and the corporation engaged in performing the public service. With these decisions and this rule before the court, we proceed to inquire whether, upon the evidence submitted in support of the motion for a temporary injunction, it appears probable that the complainant will be successful upon the final hearing in showing that the ordinance under consideration will have the effect of depriving complainant of just compensation for the public service in which it is engaged.

The bill of complaint, verified by the oath of the president of the complainant corporation, alleges that the property now actually used and necessary and essential in supplying said city and county and its inhabitants with pure fresh water is of the value largely in excess of $40,000,000. The bill also alleges that the city engineer has estimated the value of complainant's property to be $28,024,389, but that said estimate is unjust, unreasonable, unfair, inequitable, untrue, and oppressive, and that on the 28th day of February, 1903, and on March 9, 1903, the actual value of the property actually in use and owned by complainant in supplying said city and county and its inhabitants with water was and is a sum largely in excess of $40,000,000. The affidavit of Pelham W. Ames, the secretary of the complainant, alleges that the entire tangible assets of the complainant, as shown by its books of account, are $36,356,235.78 and upwards. The affidavit of H. Schussler, the chief engineer of the complainant, alleges that the value of complainant's property, excluding its water rights and

its franchise, and including, among other things, its reservoir sites, watersheds, filter beds, head works, conduits, and distributing systems, which are at the present time used in distributing water to the city and county of San Francisco and its inhabitants, in affiant's opinion, based upon his knowledge and experience, is at least the amount set forth in a detailed statement, which amounts to a total of $34,-718,600.

The defendants, in their answer, deny literally the allegation of the bill that complainant's property is of the value of $40,000,000, or of any value exceeding $20,000,000. In support of defendants' claim that the value of complainant's property does not exceed $20,000,000, they have introduced in evidence the affidavit of Charles W. Fay, clerk of the board of supervisors, to the effect that complainant's property, assessed in a number of localities in the state, aggregates in assessed valuation the sum of $13,785,632, including an assessment in the city and county of San Francisco upon the franchise amounting to $5,332,079, leaving the assessed valuation of complainant's property in this state, exclusive of franchise, the sum of $8,453,553. That this valuation is of little value in determining the actual value of the property is disclosed by the difference between this valuation and a valuation of tangible assets of the complainant as shown by its books. The affidavit of A. B. Thompson, introduced in evidence by the defendants, avers that he has examined complainant's books, and finds that the valuation of complainant's tangible assets amounts to $24,-111,974.36. This valuation is, of course, exclusive of the franchise. The city engineer appears also to have made a careful appraisement of complainant's property for the board of supervisors for the present year. This appraisement is summarized as follows:

Estimated value of works actually in use........................ $24,124,389
Estimated value of established business......................... 1,400,000
Suggested value of franchise, about 10 per cent. of estimated construction  .................................................... 2,500,000
                                                              _____
    Total .................................................... $28,024,389

These estimates, made for the defendants, show that, as usual, the assessed valuation is much below the real value.

Another method of determining the value of complainant's property is the value placed upon it by the public in dealing with complainant's bonds and stocks. This is one of the elements which I understand the Supreme Court of the United States to say may be considered, and which I do not understand the Supreme Court of the state to say may not be considered in this connection. The capital stock of the complainant is $14,000,000, divided into 140,000 shares, of the par value of $100 each. These shares have all been issued and the capital paid in at par. No part of this stock appears to be fictitious. The stock is not divided into preferred and common shares, but is all one class of stock. There is no evidence before the court that the capitalization of the corporation is excessive, except a general charge, unsupported by any facts. The complainant has a bonded indebtedness of $13,975,000. It is not claimed that the borrowed money represented by this indebtedness had not gone into the property of the corporation, nor is it claimed that this indebtedness is

excessive or fictitious. The annual interest charge on this indebtedness is $659,000, or less than 5 per cent., indicating that those who took the bonds considered complainant's property as affording ample security for the loans. It appears, further, that the floating or unsecured indebtedness of the complainant is $1,017,500, and that the annual interest charge on this indebtedness is $55,800, or a little more than 5 per cent. There is no claim that this indebtedness is fictitious or excessive in amount, or that the complainant does not have property actually representing this indebtedness. The rate of interest on this indebtedness indicates that those who have advanced the funds considered the business and property of the complainant sufficient guaranty for the loans. The capital stock and indebtedness of the complainant may be summarized as follows':

| | |
|---|---:|
| Capital stock | $14,000,000 |
| Bonded indebtedness | 13,975,000 |
| Floating indebtedness | 1,017,500 |
| | $28,992,500 |

There is, however, one objection to this estimate. During the month of April of the present year the stock of the corporation sold as low as $83⅜ per share and as high as $85, the average selling price being about $84 per share. If the whole capital stock of the corporation were valued at the rate of $84 per share, the entire capital stock would be worth only $11,760,000, and it is contended by the defendants that under this method of ascertaining the value of complainant's property no greater sum than the present market value of the stock should be considered. It is contended, on the other hand, that this reduced valuation would be unfair and unjust. It is probably true that only a small part of the capital stock could be bought at this price. It is also true that the stock market is not always a safe guide to values. It may be influenced by considerations that do not affect the real value of the property, and in the present case it is alleged in the bill of complaint that the action of the board of supervisors in passing ordinances reducing water rates has caused the reduction in the value of the stock. It is also suggested that the action of the city in adopting the new charter, which went into effect on January 8, 1900, and which contains provisions for the acquisition of public utilities, and specifically the acquisition of waterworks by the city and county, has affected the market value of the stock of the complainant corporation. However this may be, the fact remains that in the year 1899 the stock of this corporation sold as high as $103 per share, and there is nothing in the record tending to show any depreciation in the value of the property since that time; on the contrary, the phenomenal growth of the city during the past three years, and the increase in the consumption of water, should rather have tended to at least maintain the par value of the stock. But, for the purpose of the present inquiry, evidence of the influences operating upon the market price of the stock may well be disregarded, and the court confine itself to the consideration of the simple question, what does the public consider complainant's stock to be worth? We will assume, for the present purpose, that it is $84 per share, at which rate

the entire capital stock would be worth $11,760,000. The present market value of complainant's capital stock and the indebtedness may then be summarized as follows:

Capital stock, present value ................................... $11,760,000
Bonded indebtedness .......................................... 13,975,000
Floating indebtedness ........................................ 1,017,500
                                                              _____
     Total ................................................. $26,752,500

For present purposes this appears to be a fair valuation of complainant's property. It is less than the appraisement of the city engineer, including the values of the franchise and the established business. It is also less than the tangible assets of the company, as estimated by the defendants' expert accountant, A. B. Thompson, if we add to his estimate the franchise and the value of the established business as determined by the city engineer. The evidence may establish a greater valuation for the final determination of the case upon the merits. It does not seem probable that it will be less.

The next question to be considered is, what will be a fair and reasonable income for the complainant to receive as a just compensation for the public use of its property? A number of bankers have testified as to the usual and customary net income from investments of $10,000,000 and upwards of capital in corporations of a quasi public nature, where judiciously managed. The affidavits of four bankers of long experience and well-known character and standing fix the rate at not less than 7 per cent. per annum, and aver that a net income of less than 7 per cent. per annum from large investments would not be a reasonable or fair return. The affidavits of five bankers of like standing and character and similar experience fix the rate at not less than 6 per cent. per annum, and aver that a net income of less than 6 per cent. per annum for large investments would not be a reasonable or fair return. The affidavit of one banker of large wealth and experience fixes the rate of net income from such investments at between 4 and 5 per cent. per annum. The weight of evidence is clearly in favor of a rate of not less than 6 per cent. per annum. This evidence is further supported by the provisions of the act of the Legislature approved March 12, 1885 (St. Cal. 1885, p. 95, c. 115), providing for the control, sale, rental, and distribution of appropriated water in the several counties of the state. This act provides that the rates fixed by the board of supervisors for the various counties shall be so adjusted that the net annual receipts and profits to the persons, companies, associations, and corporations furnishing water to the inhabitants of such counties shall not be less than 6 nor more than 18 per cent. per annum, presumably because the Legislature considered that investments of capital by private individuals in a public work and service that the state might otherwise undertake would be reasonably entitled to receive at least 6 per cent. income on the investment, and that more than 18 per cent. would be unreasonably large. This act does not, in terms, apply to the city and county of San Francisco, but there seems to be no good reason why private capital invested in a public use for the benefit of the people of the city and county of San Francisco is not entitled to the same presumption as to what

would be reasonable compensation for its use as capital invested for the benefit of the people in other counties of the state. But in the present inquiry all doubts as to facts in controversy should be resolved in favor of the defendants, having in view what was said by the Supreme Court in San Diego Land Co. v. National City, 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154, that judicial interference should never occur unless the case presents clearly and beyond all doubt a flagrant attack upon the rights of property. In view, therefore, of all the circumstances, the court is of the opinion that the complainant is entitled to receive at least 5 per cent. as the net compensation it is entitled to receive on the value of its property. With these estimates determined, the following result is reached: The value of complainant's property is at least $26,752,500. The rate of income or profit should not be less than 5 per cent., or $1,337,625, as the net compensation for the year. It appears from the evidence that the operating expenses of the corporation for the year will be $506,000, and taxes $286,390; making the total expenses $792,390. Adding this sum to the net compensation of $1,337,625, the gross income for the year should be $2,130,015. The complaint asks that an allowance be made of $196,000 for the element of deterioration of the perishable part of the plant during the year. It seems just and proper that such an allowance should be made. It is sanctioned by authority, but I do not think it necessary to take that element into consideration at this time.

The question now occurs, will the ordinance under consideration produce a gross income of $2,130,015? It appears that the estimated receipts of the complainant for the fiscal year ending June 30, 1903, under the present ordinance, will be $1,998,906; that for the year ending June 30, 1904, there will probably be an increase in the delivery of water to private consumers. What this increase will be, or the income therefrom, cannot be determined very satisfactorily from the record before the court. One estimate is that there will be an increase in income amounting to $80,000; another, $86,786; and still another, $102,000. The first and last estimates appear to be made by the officers of the complainant, and the second by a member of the board of supervisors. In the absence of more definite proof upon the subject, the doubt as to the actual fact will be resolved against the complainant, and the increase estimated at $102,000. The total receipts of the complainant from all sources for the year ending June 30, 1904, would, therefore, not exceed $2,100,906. From this sum is to be deducted the reduction upon present rates for private consumers, as provided in the ordinance under consideration, namely, a reduction of approximately 7 per cent. It is estimated that this reduction will amount to the aggregate sum of $130,361. The gross income of the complainant, under the ordinance, would then be $1,970,545, or $159,470 less than the income it is entitled to receive as just compensation for the public use of its property at a reasonable and fair valuation. The effect of this reduction upon the rate of income that complainant would receive, under the ordinance, upon these estimates, would be the relation which the amount of the net income, namely, $1,178,155, bears to the value of complainant's property,

namely, $26,752,500, which would be $4^{40}/_{100}$ per cent., or $^{60}/_{100}$ per cent. less than just compensation for the public use of complainant's property, considered with respect to its valuation in the manner herein adopted.

The same general result is reached by still another calculation. The gross income of the complainant will be, as stated, $1,970,545. The operating expenses will amount to $506,000, and taxes the sum of $286,390. Deducting these two sums from the gross income of the complainant, there remains the sum of $1,178,155 available for the payment of interest on complainant's bonded and floating indebtedness and dividends for stockholders. Deducting from this sum the total annual interest charge on the indebtedness, there remains the sum of $462,855 as net income available for dividends to stockholders, a sum which equals $3^3/_{10}$ per cent. on the par value of $14,000,000 of stock. These various sums may be tabulated, as follows:

| | | |
|---|---:|---:|
| Receipts for fiscal year ending June 30, 1903.................... | | $1,998,906 |
| Estimated increase in receipts for fiscal year ending June 30, 1904 ...................................................... | | 102,000 |
| Total receipts for year ending June 30, 1904................. | | $2,100,906 |
| Deduct reduction of rates for private rate payers, provided in ordinance ................................... | $130,361 | |
| Operating expenses for year ............................ | 506,000 | |
| Taxes ................................................ | 286,390 | |
| | | 922,751 |
| Balance remaining for payment of interest on indebtedness and dividends to stockholders .......................... | | $1,178,155 |
| Total annual interest charge on bonded and floating indebtedness amounts to .............................................. | | 715,300 |
| Amount available for dividends ($3^3/_{10}$ per cent. on $14,000,-000) ................................................ | | $ 462,855 |

But, before reaching a final conclusion upon the subject, one other element should be considered, and that is, from the standpoint of the consumer, is the water rate he is paying excessive? If it is, there should be an adjustment for that condition. From the brief of the city and county attorney it appears that the average water rate required to be paid for a six-room house in 30 of the large cities of the Union is $17.25 per annum. The present rate in San Francisco for the same house is $17.40 per annum, or a very little above the average. This does not appear to be excessive or unjust, in view of the fact that the conditions prevailing on the peninsula of San Francisco with respect to a water supply are very different from those prevailing in or near most of the large cities of the United States.

In the case of the Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173, heard in the Supreme Court in the year 1883, Mr. Justice Field, in a dissenting opinion, correctly described the situation at San Francisco as to the water supply as it then existed, and the relation of the complainant to the work of supplying the demand. He said:

"The necessary supply of water could not be obtained from any natural streams or lakes on the peninsula, upon the upper end of which the city and county are situated. A small lake near the city furnished an insufficient

supply, and of inferior quality. The company, therefore, soon after its incorporation, undertook to collect the required quantity in artificial reservoirs, as it descended in rain from the heavens. At a distance of about twenty miles from the city there is a natural ravine lying between the mountains near the ocean and the hills bordering the Bay of San Francisco. The company acquired the lands within this ravine and on its sides, amounting, as represented by counsel, to eighteen thousand acres, and erected in it heavy walls at long distances apart, thus making great reservoirs, into which the water was collected until lakes were formed extending several miles in length. With aqueducts, pipes, and other conduits, the water thus collected was carried to the city and distributed in mains. It is said that the cost of these works to the company amounted to nearly fifteen millions of dollars. Before their construction and the introduction of this water, the inhabitants of the city were poorly and inadequately supplied. With the completion of the works of the plaintiff all this was changed. Water was furnished to all persons calling for it at their houses, and, if desired, in every room, and to the city in abundance for all its needs."

From the affidavit of Mr. Schussler, complainant's chief engineer, it appears that the present area of the several tracts of land used as watersheds, reservoir sites, and filter beds aggregate 65,752 acres, and are of the value of $16,503,600, and that the head works, conduits, and distributing system is of the value of $18,215,000, making a total of $34,718,600. In comparing the water rates of San Francisco with the water rates in other cities, these facts may well be considered, and in this light the rates do not appear to be unreasonable.

If, as appears from the weight of the expert evidence before the court, 6 per cent. per annum is the smallest income that can be considered reasonable for the investment under consideration, and 5 per cent. per annum the smallest income which the court can, under all the circumstances of this inquiry, consider as reasonable and just, manifestly $4^{40}/_{100}$ per cent. on the value of the property, or $3^{30}/_{100}$ per cent. on the capital stock of the corporation, is unreasonably low and confiscatory, and amounts to the taking of private property for public use without just compensation, thereby depriving the complainant of its property without due process of law. The small difference between a rate of income that would yield just compensation and one that would not, does not render the controversy any the less important, or the result any the less an infraction of a constitutional right.

What is the meaning of "just compensation"? It is a constitutional phrase, and is found in section 14 of article 1 of the Constitution of this state, where it is provided that property shall not be taken or damaged for public use without just compensation. It is in this constitutional sense that it is used by the Supreme Court of this state in the San Diego Case, and by the Supreme Court of the United States in the cases where this question has been under consideration. In Monongahela Navigation Co. v. United States, 148 U. S. 312, 329, 13 Sup. Ct. 622, 37 L. Ed. 463, the Supreme Court of the United States, referring to what constituted "just compensation," said, "Before this property can be taken away from its owners, the whole value must be paid." And in Virginia and Truckee R. R. Co. v. Henry, 8 Nev. 170, the Supreme Court of Nevada said:

"It is difficult to imagine an unjust compensation; but the word 'just' is used evidently to intensify the meaning of the word 'compensation,' to con-

vey the idea that the equivalent to be rendered for property taken shall be real, substantial, full, ample; and no Legislature can diminish by one jot the rotund expression of the Constitution."

Neither is it in the power of the court to diminish the measurement of just compensation in any degree. Just compensation is an absolute fact, and, when ascertained, must be so regarded in any judgment the court may render. As said by Mr. Guthrie, in his lectures on the fourteenth amendment to the Constitution of the United States, in construing or expounding a constitution, the ancient maxim, "De minimis non curat lex," has no application. "The violation of a constitutional right should never be measured or met by any such plea. It is said that counsel once attempted to argue before Chief Justice Marshall that in the particular instance before the court the invasion of constitutional rights was slight; but he was sternly reminded that the case involved the Constitution of the United States and that the degree or extent of the invasion had no bearing upon the point. When a constitutional right is invaded, we are not bound to stand silent so long as moderation is practiced. There can be no greater political blindness, no more dangerous policy, than to sanction the infringement of constitutional rights because the particular instance is in itself apparently harmless, or seems expedient. Admit the wedge ever so little, and there is nothing to prevent its being driven home. We are not compelled to wait until the unconstitutional measure becomes ruinous confiscation, or an intolerable interference with personal liberty. In respect of constitutional guaranties, we have a right to expect absolute security and protection, and the courts are under a duty to enforce the constitutional provisions guarantying our rights wholly irrespective of the degree of infringement. Present inconvenience, however great, present expediency, however tempting, can never justify the slightest disregard of any provision of a constitution."

In this discussion I have not considered the controversy concerning hydrant rates for water supplied to the city, alleged by the complainant to be unreasonably low, nor have I considered the water rates for public buildings paid for by the city. The questions discussed have had relation only to the rights of private consumers, and in this connection the court at the close of the oral argument suggested a query as to the effect of an injunction upon private consumers directed to the defendants the board of supervisors, or the officers of the municipal corporation. An examination of the authorities submitted by the counsel for the complainant with this question in view has satisfied me that there will be no difficulty in this aspect of the case. The board of supervisors, or the municipal corporation, or perhaps both, represent the water rate payers in this controversy, and are bound by the proceedings. This has been established by abundant authority. Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; San Diego L. & T. Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego L. & T. Co. v. Jasper (C. C.) 110 Fed. 702; San Diego L. & T. Co. v. Jasper, 23 Sup. Ct. 571, 47 L. Ed. 892; Los Angeles City Water Co. v. Los Angeles (C.

C.) 88 Fed. 720; Chicago & Northwestern Ry. Co. v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744; Spring Valley Waterworks v. Bartlett (C. C.) 16 Fed. 615, 8 Sawy. 555; Spring Valley Waterworks v. San Francisco, 82 Cal. 286, 22 Pac. 910, 6 L. R. A. 756, 16 Am. St. Rep. 116; San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261.

It follows that, in view of all the circumstances of this case, the court is of the opinion that the ordinance will not furnish the complainant a just or fair compensation for the service to be rendered, or a reasonable and just return for the use of its property; that the ordinance will be confiscatory in effect, and deprive complainant of its property without just compensation and without due process of law; and that it is probable that upon the final hearing it will be so determined.

A preliminary injunction will therefore issue, restraining the defendants pendente lite from enforcing either the ordinance of March 9, 1903, or the ordinance of May 23, 1903; and the complainant will give bond in the sum of $135,000 to answer all damages which the defendants or any person injured by reason of this injunction may sustain if, upon the entry of a final decree upon the merits, it shall be determined to have been improperly issued.